[L.A. No. 31718. Aug. 18, 1983.]

BILL PRESS et al., Plaintiffs and Appellants, v.
LUCKY STORES, INC., Defendant and Respondent.

314

**COUNSEL**

Lucas Guttentag, Fredric D. Woocher, Carlyle W. Hall, Jr., John R. Phillips and Bruce Williamson for Plaintiffs and Appellants.

Marjorie L. Fine, Andrew W. Lafrenz, Richard S. Reisman and Donahue, Gallagher, Thomas & Woods for Defendant and Respondent.

**OPINION**

**BIRD, C. J.**—The sole issue presented by this case is whether the trial court abused its discretion in awarding, and calculating the amount of, attorney fees under section 1021.5 of the Code of Civil Procedure.[1]

---

[1]Code of Civil Procedure section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor."

Unless otherwise noted, all statutory references are to the Code of Civil Procedure.

I.

Plaintiffs, Bill Press and the California Oil Profits Coalition, sought to qualify an initiative measure for the June 1980 statewide election.[2] The Elections Code required plaintiffs to submit 346,119 valid signatures of registered California voters before December 1, 1979. In order to ensure that a sufficient number of the signatures collected would be valid, plaintiffs' goal was to collect at least 500,000 signatures.

Plaintiffs sought to circulate petitions on the premises of several privately owned shopping centers. Among the locations at which they attempted to gather signatures was the area directly in front of a Santa Monica supermarket owned by defendant Lucky Stores. The store was located in a shopping center which contained 16 other businesses.

After five days of uninterrupted solicitation, plaintiffs were ordered by store officials to stop gathering signatures in front of the store. The petition circulators were also threatened with arrest if they refused to comply immediately with the demand to leave. Plaintiffs thereupon filed an action for injunctive relief in the superior court. The court issued a temporary restraining order and a preliminary injunction restraining defendant from denying plaintiffs access to the premises.

Plaintiffs obtained approximately 3,000 signatures at defendant's store and 556,000 signatures statewide. Their initiative measure qualified as Proposition 11 on the June 1980 ballot, but was defeated by the voters.

Plaintiffs were represented in the superior court by the Center for Law in the Public Interest (CLIPI), a nonprofit corporation which provides legal services without charge in cases which raise issues of broad public interest. After the election, plaintiffs sought an award of attorney fees pursuant to section 1021.5. The amount requested was $20,940.[3] Defendant opposed

---

[2]California Oil Profits Coalition was an unincorporated association composed of citizen and labor groups including the League of Women Voters, the Sierra Club, the San Diego Urban League and the California Federation of Labor, AFL-CIO. Bill Press was the official proponent of the initiative. (See Elec. Code, § 3502.)

[3]Plaintiffs submitted to the court a "lodestar" or "touchstone" figure of $13,960. They obtained this figure by multiplying the number of hours each CLIPI attorney spent on the case by a reasonable hourly rate. The $13,960 figure was broken down as follows: one senior attorney spent 12.5 hours at an hourly rate of $135, two junior attorneys spent 115 hours at $77 per hour, and a first year attorney spent 54 hours at $62 per hour. The hourly rates were arrived at by averaging the rates used for each category of attorney in past cases in which CLIPI had been awarded fees, multiplied by an inflation adjustment factor obtained from the United States Bureau of Labor Statistics.

Plaintiffs requested that this touchstone figure be multiplied by a factor of 1.5 "to reflect the broad public impact of the results obtained and to compensate for the high quality of work performed and the contingencies involved in undertaking this litigation." Thus, the attorney fees sought by plaintiffs totaled $20,940.

the motion, arguing (1) that plaintiffs were not entitled to any fees at all because they had not conferred a "significant benefit" on the public or a large number of persons, and (2) that if plaintiffs were entitled to fees, the amount requested was unreasonable.

Finding that plaintiffs had satisfied the statutory requisites for an award of fees, the superior court granted plaintiffs' motion. However, the court concluded that the only benefit conferred by the litigation was its impact on the signature drive at the Santa Monica Lucky store. The court further reasoned that a reasonable fee could be computed by multiplying the requested amount by 3,000/556,000—a fraction representing the ratio of petition signatures obtained at the Santa Monica store to the number of signatures obtained statewide. Accordingly, the court awarded plaintiffs $112.98 in attorney fees.

Plaintiffs appeal, contending that the trial court abused its discretion in calculating the amount of the fee award. They argue that the trial court failed to follow the "lodestar adjustment" method approved by this court in *Serrano* v. *Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*). Instead, plaintiffs contend that the court used an arbitrary method of calculation which resulted in an award bearing no reasonable relationship to the lodestar figure.

Defendant responds that the litigation did not confer a "significant benefit" on the public or a large class of people. Thus, it argues, the trial court should not have even granted the motion for attorney fees. Since plaintiffs were not entitled to fees in any amount, the argument continues, they were not prejudiced by any error the trial court may have made in calculating the award.

## II.

■ ■■■ The first issue this court must decide is whether the trial court abused its discretion in concluding that plaintiffs were entitled to attorney fees under section 1021.5.[4]

■ Section 1021.5 is a codification of the private attorney general doctrine adopted by this court in *Serrano III, supra,* 20 Cal.3d 25. (*Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200].) The award of attorney fees is proper under

---

[4]Defendant did not cross-appeal from the decision below. This court must nevertheless review that decision in order to evaluate defendant's contention that plaintiffs were not prejudiced by any error the trial court may have made in computing the amount of attorney fees. (§ 906.)

section 1021.5 if "(1) plaintiffs' action 'has resulted in the enforcement of an important right affecting the public interest,' (2) 'a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons' and (3) 'the necessity and financial burden of private enforcement are such as to make the award appropriate.'" (*Id.*, at p. 935.)[5]

■ Defendant does not dispute that plaintiffs' action "resulted in the enforcement of an important right." Indeed, the litigation enforced the people's fundamental rights of free expression and petition guaranteed by article I, sections 2 and 3 of the California Constitution. (*Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341], affd. (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035].) In *Serrano III*, this court said it well. "The determination that the public policy vindicated is one of constitutional stature . . . establishes the first of the . . . elements requisite to the award (i.e., the relative societal importance of the public policy vindicated)." (20 Cal.3d at p. 46, fn. 18.)

■ Rather, defendant contends that no "significant benefit" was conferred on the public by the litigation since the superior court simply applied principles already established in *Pruneyard, supra,* 23 Cal.3d 899, to plaintiffs' activities. This argument suggests (1) that only those plaintiffs who prevail in "landmark" cases may be entitled to an award of fees, and (2) that the benefit conferred in this case was insubstantial because it extended only to those patrons of the Santa Monica store who signed the petitions. Both of these suggestions lack merit.

The fact that litigation enforces existing rights does not mean that a substantial benefit to the public cannot result. Attorney fees have consistently been awarded for the enforcement of well-defined, existing obligations. (See, e.g., *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988 [165 Cal.Rptr. 514] [suit to compel the preparation of an environmental impact report as required by state and local environmental quality guidelines]; *Rich* v. *City of Benicia* (1979) 98 Cal.App.3d 428 [159 Cal.Rptr. 473] [same].)

Indeed, the declaration of rights in "landmark" cases would have little meaning if those rights could not be "enforced" in subsequent litigation. As this court noted in *Woodland Hills, supra,* 23 Cal.3d at page 933, "without some mechanism authorizing the award of attorneys fees, private actions

---

[5]Subdivision (c) of section 1021.5, which requires that "such fees should not in the interest of justice be paid out of the recovery, if any" is inapplicable here since plaintiffs' action did not produce any monetary recovery.

to enforce . . . important public policies will as a practical matter frequently be infeasible." Such a cramped interpretation of section 1021.5 would allow vital constitutional principles to become mere theoretical pronouncements of little practical value to ordinary citizens who cannot afford the price of vindicating those rights.[6]

In addition, this court does not agree with defendant that the benefits resulting from this litigation were not conferred on "the general public or a large class of persons." (See § 1021.5.) There can be no doubt that vindication of the rights at stake in this litigation effectuated fundamental constitutional principles. Freedom of speech is "a right which is at the fountainhead of all our liberties . . . ." (*Diamond* v. *Bland* (1974) 11 Cal.3d 331, 342 [113 Cal.Rptr. 468, 521 P.2d 460] (dis. opn. of Mosk, J.), cert. den., 419 U.S. 885 [42 L.Ed.2d 125, 95 S.Ct. 152].) And, as this court stated in *Pruneyard, supra,* 23 Cal.3d at pages 907-908, "[t]he right [to petition] in California is . . . vital to a basic process in the state's constitutional scheme—direct initiation of change by the citizenry through initiative, referendum, and recall." While these rights are by nature individual rights, their enforcement benefits society as a whole. Indeed, only by protecting each individual's free speech and petition rights will society's general interests in these rights be secured.

In *Serrano III,* this court recognized that attorney fees were proper under the private attorney general doctrine "simply because of the magnitude and significance of the fundamental constitutional principles involved in that litigation and the benefit that flowed to the general public in having such principles enforced." (*Woodland Hills, supra,* 23 Cal.3d at p. 939.) The fundamental constitutional principles there involved were embodied in the equal protection clause of the state Constitution. (*Serrano III, supra,* 20 Cal.3d at p. 31.) ▐ ▐▐▐ ▐ Here, similarly, the general public benefitted from the enforcement of fundamental constitutional rights—those embodied in the free speech and petition provisions of the California Constitution.[7]

---

[6]In any event, the superior court did more than simply apply principles already established in *Pruneyard.* Defendants argued strenuously in the trial court that there were significant factual distinctions between *Pruneyard* and this case. The Santa Monica store was situated among 16 other stores in a relatively small shopping center. In contrast, the Pruneyard center covered 21 acres and contained 65 shops, 10 restaurants and a cinema. (*Pruneyard, supra,* 23 Cal.3d at p. 902.) Thus, as defendants implicitly admit, plaintiffs' action clarified that *Pruneyard* applied to small shopping centers as well as large ones.

[7]Of course, not all lawsuits enforcing constitutional guarantees will warrant an award of fees. For example, in *Pacific Legal Foundation* v. *California Coastal Com.* (1982) 33 Cal.3d 158 [188 Cal.Rptr. 104, 655 P.2d 306], this court held that plaintiffs were not entitled to attorney fees since their litigation, while based on the constitutional right to be free from the arbitrary deprivation of private property, vindicated only the rights of the property

In any event, this litigation did directly affect a "large class of persons." Declarations filed in support of plaintiffs' motion for attorney fees established that plaintiffs were able to use the injunction obtained in this action to gain access to additional shopping centers throughout the state.

Defendant contends that since this same result could have been achieved by informing store officials of the *Pruneyard* decision (23 Cal.3d 899), the access to other shopping centers may not properly be considered a result of *this* litigation. That contention is, at best, disingenuous. Before filing this action, plaintiffs' attorneys attempted to use that precise technique to gain access to the Santa Monica Lucky store. Plaintiffs' efforts were unavailing. Defendant persistently adhered to its established policy of prohibiting all nonbusiness-related speech—with the exception of noncontroversial charitable fund-raising events and nonpartisan voter registration drives—on its premises.  ■  ■■■  Moreover, defendant's declarations later admitted it had not intended to abide by *Pruneyard*—even though it was clearly the law of this state[8]—unless that decision was affirmed by the United States Supreme Court.[9]

■ Only after plaintiffs obtained the injunction involving defendant's Santa Monica store was defendant's attorney willing to advise other Lucky

---

owners of the single parcel at issue.

In *Pacific Legal Foundation,* two considerations not present here combined to make an award unwarranted. First, the litigation enforced plaintiffs' right to be free from an unconstitutional taking of their private property. While that right was certainly important, the economic interests protected in that case can hardly be considered as fundamental as the equal protection rights vindicated in *Serrano v. Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929], or the freedom of speech and petition rights enforced in the present case.

Second, the primary effect of the judgment in *Pacific Legal Foundation* was merely to invalidate a condition placed on a land use permit which encumbered the value of a single parcel of property. Only plaintiffs' personal economic interests were advanced by their lawsuit. Under those factual circumstances, the litigation "did not result in conferring a 'significant benefit' on a 'large class of persons.'" (*Pacific Legal Foundation, supra,* 33 Cal.3d at p. 167.)

In this case, by contrast, plaintiffs had no personal pecuniary interest in the subject of the litigation. Instead, they sought to enforce their fundamental rights to speak freely and to petition the government. Litigation enforcing these rights necessarily confers a significant benefit on society as a whole.

[8]The pendency of *Pruneyard* before the United States Supreme Court did not suspend defendant's obligation to abide by this court's decision in that case. "Neither the filing nor the granting of a petition for certiorari operates as a stay, either with respect to the execution of the judgment below or the issuance of the mandate below to a lower court. Similarly, the filing of a notice of appeal or the jurisdictional statement, or the noting of probable jurisdiction, does not operate as a stay or supersedeas." (Stern & Gressman, Supreme Court Practice (5th ed. 1978) p. 847, fn. omitted.)

[9]*Pruneyard* was affirmed by the Supreme Court on June 9, 1980 (*Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035]), more than six months after the deadline for plaintiffs to submit their petitions.

stores to permit plaintiffs access to their premises. Thus, the effect of this litigation clearly extended beyond the premises of the Lucky store in Santa Monica.

Moreover, even if the impact of plaintiffs' lawsuit were limited to the access gained at the Santa Monica store, the litigation would still have benefitted a "large class of people." In addition to the approximately 3,000 persons who signed plaintiffs' petitions, countless others (i.e., nonsigning store patrons) were educated about a contemporary issue of public importance.[10] In addition, while gathering signatures at the Santa Monica store plaintiffs were able to enlist additional volunteers and accept financial contributions. For these reasons, plaintiffs' litigation satisfies the "substantial benefit" requirement of section 1021.5.

■ Plaintiffs' action also fulfills section 1021.5's mandate that "the necessity and financial burden of private enforcement [be] such as to make the award appropriate." This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.[11] Since plaintiffs had no pecuniary interest in the outcome of the litigation, "the financial burden in this case [was] such that an attorney fee award [was] appropriate in order to assure the effectuation of an important public policy." (*Woodland Hills, supra,* 23 Cal.3d at p. 942.)

Since plaintiffs' litigation satisfied all the applicable requirements of section 1021.5, the trial court did not abuse its discretion in awarding attorney fees.

### III.

Next, this court must consider whether the trial court erred in calculating the amount of the attorney fees awarded.

■ When a party is entitled to attorney fees under section 1021.5, the amount of the award is determined according to the guidelines set forth by this court in *Serrano III, supra,* 20 Cal.3d at pages 48-49.

---

[10]Even if only the persons who actually signed the petitions are counted, the number of direct beneficiaries—comprising a class numbering in the thousands—is substantial.

[11]That plaintiffs' personal interests in the outcome of the oil profits initiative were sufficient to induce them to bring this action is irrelevant. As the statute makes clear, subdivision (b) of section 1021.5 focuses not on plaintiffs' abstract personal stake, but on the financial incentives and burdens related to bringing suit. Indeed, in the absence of some concrete personal interest in the issue being litigated, the putative plaintiff would lack standing to bring an action. (See 3 Witkin, Cal. Procedure (2d ed. 1971) Pleading, § 93, pp. 1768-1770.)

*Serrano III* requires the trial court to first determine a "touchstone" or "lodestar" figure based on a "careful compilation of the time spent and reasonable hourly compensation for each attorney . . . involved in the presentation of the case." (20 Cal.3d at p. 48; *Serrano v. Unruh* (1982) 32 Cal.3d 621, 625 [186 Cal.Rptr. 754, 652 P.2d 985] *(Serrano IV).*) That figure may then be increased or reduced by the application of a "multiplier" after the trial court has considered other factors concerning the lawsuit.[12]

The proper determination and use of the lodestar figure is extremely important. As this court noted in *Serrano III,* " 'The starting point of every fee award . . . must be a calculation of the attorney's services in terms of the time he has expended on the case. Anchoring the analysis to this concept is the only way of approaching the problem that can claim objectivity, a claim which is obviously vital to the prestige of the bar and the courts.' " (20 Cal.3d at p. 48, fn. 23, quoting *City of Detroit* v. *Grinnell Corp.* (2d Cir. 1974) 495 F.2d 448, 470.)

Ultimately, the trial judge has discretion to determine "the value of professional services rendered in his [or her] court . . . ." *(Serrano III, supra,* 20 Cal.3d at p. 49.) However, since determination of the lodestar figures is so "[f]undamental" to calculating the amount of the award, the exercise of that discretion must be based on the lodestar adjustment method. *(Id.,* at pp. 48-49; *Mandel* v. *Lackner* (1979) 92 Cal.App.3d 747, 758 [155 Cal.Rptr. 269] *(Mandel II).*)

In this case, plaintiffs submitted a lodestar figure of $13,960 and requested that it be multiplied by a factor of 1.5 (i.e., enhanced by 50 percent) "to reflect the broad public impact of the results obtained and to compensate for the high quality of work performed and the contingencies involved in undertaking this litigation."

The trial court, however, did not use plaintiffs' lodestar figure nor engage in a *Serrano*-type analysis of the various factors which might justify modifying that sum. Instead, the trial court devised its own arbitrary formula for

---

[12]*Serrano III* set forth a number of factors the trial court may consider in adjusting the lodestar figure. These include: "(1) the novelty and difficulty of the questions involved, and the skill displayed in presenting them; (2) the extent to which the nature of the litigation precluded other employment by the attorneys; (3) the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award; (4) the fact that an award against the state would ultimately fall upon the taxpayers; (5) the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved; [and] (6) the fact that the monies awarded would inure not to the benefit of the attorneys involved but the organizations by which they are employed." (20 Cal.3d at p. 49, fn. omitted.)

determining the amount of fees. First, the court determined that plaintiffs had obtained 3,000 signatures at the Santa Monica Lucky store. The court then computed the fee award by multiplying the $20,940 requested by plaintiffs by 3,000/556,000—the ratio of petition signatures obtained at the Santa Monica store to the number obtained statewide. The fee awarded plaintiffs amounted to $112.98.

Defendant has wisely abandoned its contention that the trial court properly followed the lodestar adjustment method. Earlier, it had been argued that the trial court reached its $112.98 result by applying a "negative multiplier"—designed to reflect the narrow scope of the litigation—to plaintiffs' lodestar figure.

However, defendant's contention failed for two reasons. First, the court's calculation never even referred to the lodestar figure. The fraction devised by the court was multiplied not by the lodestar figure, but by the enhanced amount requested by plaintiffs.

Second, the trial court's fraction was not a valid "negative multiplier" under *Serrano III, supra.* Under the trial court's analysis, the 3,000 figure represented the number of signatures attributable to plaintiffs' action, and the 556,000 figure represented the number collected by unrelated means. The court thus improperly intertwined the determination of the litigation's importance with the question—which should arise only after it has been concluded that an award is proper—of the amount to be awarded. The latter inquiry requires the court to consider a wide range of factors including the skill of the attorneys, the difficulty of the case, and the contingencies involved in prosecuting the action. (See *ante,* fn. 12.) The fraction devised by the court was designed not to take into account these *Serrano III* factors, but to reflect only the trial judge's view of the results achieved by the litigation. As such, it was not a proper adjustment mechanism or "multiplier."

In any event, the court's 3,000/556,000 ratio was an illogical measure of the results obtained by the litigation. The fact that the total number of signatures gathered throughout the state greatly exceeded the number gathered at the Santa Monica store did not diminish the importance of the rights secured. The vindication of plaintiffs' freedom of speech and petition rights would have been complete even if plaintiffs had obtained no signatures following the injunction.

Lawsuits enforcing the right to speak freely or to petition the government for redress of grievances frequently arise when a single person or a small group is prohibited from speaking about a particular subject or at a partic-

ular place. Yet the rights that are vindicated inure to all persons and strengthen our democratic institutions as a whole. The results obtained by litigation seeking to enforce such fundamental constitutional rights cannot be measured by counting the number of people who want to speak, march, or sign a petition.

The flaw in the trial court's approach is also evident from the fact that a positive multiplier would be impossible. The number of signatures collected statewide would never be less than the number attributable to the specific litigation in which fees are sought. Thus, use of the trial court's multiplier would have the anamolous result of never augmenting, and always diminishing, the lodestar amount.

Finally, while a trial court has discretion to determine the proper amount of an award, the resulting fee must still bear some reasonable relationship to the lodestar figure and to the purpose of the private attorney general doctrine. If there is no reasonable connection between the lodestar figure and the fee ultimately awarded, the fee does not conform to the objectives established in *Serrano III,* and may not be upheld.

In *Serrano III,* the award approved by this court was 40 percent greater than the lodestar figure. The lodestar figure was multiplied by a factor of 1.4. In *Coalition for L.A. County Planning etc. Interest* v. *Board of Supervisors* (1977) 76 Cal.App.3d 241, 251 [142 Cal.Rptr. 766], the touchstone figure was multiplied by a factor of 2, resulting in an award which was a 100 percent increase over the lodestar amount.

In this case, by contrast, the trial court divided plaintiffs' requested amount by 185! An adjustment of that magnitude so distorts the objective lodestar figure that it must be considered on its face a palpable abuse of discretion.

## IV.

Since this litigation satisfies the requisites of section 1021.5, the award of attorney fees was appropriate. However, the trial court abused its discretion in calculating the amount of the award. The lodestar adjustment method of calculating attorney fees set forth in *Serrano III* is designed expressly for the purposes of maintaining objectivity. In failing to apply these guidelines, the trial court awarded an amount which had no rational relationship to the skill, time and effort expended by plaintiffs' attorneys on this litigation.

The judgment is affirmed insofar as it establishes that plaintiffs are entitled to an award of fees for the services rendered by their attorneys. As to the

amount awarded, the judgment is reversed and the case remanded for further proceedings consistent with *Serrano III* and its progeny.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Grodin, J., concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in the judgment. Petitioners have established that their prosecution of this action yielded a significant benefit to a large class of persons thereby qualifying them for an award of attorney fees under Code of Civil Procedure section 1021.5, subdivision (a).

However, I must dissent from the majority's apparent assumption that where litigation enforces "fundamental constitutional principles" such as the rights to free speech and to petition, the lawsuit must be found to have conferred a "significant benefit" on the general public because enforcement of those rights "benefits society as a whole." (*Ante* p. 319.) The majority purports to find authority for this proposition in our decision in *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*). Yet, in *Serrano III,* we adopted a *contrary* approach: "The determination that the public policy vindicated is one of *constitutional stature* will not, of course, be in itself sufficient to support an award of fees. . . . Such a determination simply establishes the first of the three elements requisite to the award (i.e., the relative social importance of the public policy vindicated). . . . Only if it is also shown . . . that the benefits flowing from such enforcement are to be *widely enjoyed* among the state's citizens—only then will an award on the 'private attorney general' theory be justified." (20 Cal.3d at p. 46, fn. 18, italics added.)

Thus, *Serrano III* stands for the proposition that the dual requirements of (1) an important right affecting the public interest, and (2) a significant benefit to the general public or to a large class of persons, are *separate and distinct prerequisites* to an award of attorneys' fees under the "private attorney general" doctrine codified by Code of Civil Procedure section 1021.5.

The majority nonetheless appears to fuse these two prerequisites in the case of litigation enforcing fundamental constitutional principles. Granted that constitutional mandates are more important than other laws, an award of attorney fees still cannot be justified by the fact of enforcement alone. The majority asserts that such enforcement indirectly benefits society as a whole; however, it is by no means inevitable that vindication of an individual's constitutional rights will yield a significant benefit to the general public. Particularly in the area of free speech, a "realistic assessment, in light

of all the pertinent circumstances" (see *Woodland Hills Residents Assn., Inc.* v. *City Council* (1979) 23 Cal.3d 917, 940 [154 Cal.Rptr. 503, 593 P.2d 200]) of the benefits conferred by such litigation would frequently indicate that the individual litigant benefits to the *detriment* of the public good. If it be suggested that litigation probing this tension between the demands of society and the rights of the individual is in itself a "benefit" within the meaning of section 1021.5, I respectfully respond that the statutory clause, "significant benefit conferred upon the general public or a large class of persons," may not reasonably be so broadly construed. Such a construction belies both the statutory distinction between "an important right affecting the public interest" and "a significant benefit to the general public," and our own interpretation of the private attorney general theory, adopted as an equitable doctrine in *Serrano III.*

What is required by section 1021.5 is not an abstract and questionable political theory, but a realistic assessment of whether, in light of the *facts* of each case, the benefits accruing from the lawsuit *actually* flow to a significant number of the citizens of this state. In the absence of such a determination, there is no justification for requiring a defendant (or the taxpayers, in the case of a public defendant) to pay his adversary's attorney fees.