In re COUNTY OF ORANGE, a political subdivision of the State of California, Debtor.

County of Orange, Plaintiff,

v.

Merrill Lynch & Co., Inc., et al., Defendants.

And Related Cases.

Nos. SA CV 95–0037–GLT, SA CV 96–0643–GLT, SA CV 96–0771–GLT, SA CV 96–0163–GLT, SA CV 96–0765–GLT, SA CV 96–1010–GLT, SA CV 96–0772–GLT, SA CV 96–0766–GLT, SA CV 97–0066–GLT, SA CV 97–0122–GLT, SA CV 98–0526–GLT, SA CV 97–0186–GLT, SA CV 98–0525–GLT, SA CV 98–0524–GLT, SA CV 98–0527–GLT.

Bankruptcy No. SA 94–22272JR.

United States District Court,
C.D. California,
Southern Division.

Nov. 10, 1999.

J. Michael Hennigan, Hennigan, Mercer & Bennett, Los Angeles, CA, for plaintiff.

Gerald L. McMahon, Seltzer, Caplan, Wilkins & McMahon, San Diego, CA, for defendant.

## ORDER ON ATTORNEYS FEE APPLICATION

TAYLOR, District Judge.

The Court finds the parties entered into a valid and binding attorney fee agreement for a fee based on fixed "benchmark" hourly billing rates, subject to adjustment down or up at the end of the representation based on results accomplished and other agreed criteria. Strictly construing the contract against the attorneys, the final fee is not calculated by a lodestar multiplier, but, in the absence of a specific agreement for a major adjustment, the final fee is appropriately in the same general order of magnitude as the hourly "benchmark" fee. The Court finds the appropriate contract fee is an additional fee of $3 million.

## I. BACKGROUND

In 1994, Orange County, California, filed the largest municipal bankruptcy in history after failure of a risky leveraged investment scheme by its Treasurer. Since 1991 the Treasurer had managed an investment portfolio Pool, including County funds and money invested by other municipal agency Pool Participants, in a high-risk strategy dependent on continuing low interest rates. When interest rates unexpectedly rose, the Pool suffered asserted losses of about $1.6 billion, and the County declared bankruptcy.

The bankruptcy court confirmed a plan appointing a litigation Representative to litigate County and Pool Participants' liability claims against financial institutions, brokers, and other professionals who alleg-

edly shared responsibility for the Pool's financial collapse. A $50 million litigation fund was created to pay attorneys and legal expenses. The Representative entered into a July 11, 1996 retainer agreement with the lawfirm of Hennigan, Mercer & Bennett to continue the prosecution of Pool-related liability claims.

The July 11, 1996 retainer agreement contained the following attorneys fee provision:

> You will be billed at least monthly for work performed based upon the benchmark billing rates. . . . All amounts shall be due and payable upon receipt of our statement. . . .

> The benchmark rates serve as a basis for determining the reasonable amount of fees to be charged, but the fees charged will not necessarily be equal to the benchmark rates multiplied by the hours spent. It is our firm's practice to charge our clients for services rendered based upon not only the total number of hours charged at benchmark billing rates, but also upon such other factors as: the complexity of the problems presented to us; the amounts at issue; the nature, quality and extent of the opposition encountered; the results accomplished; the skill we exercise in accomplishing those results; the extent to which our services were rendered outside the Los Angeles area, after normal business hours, or on other than normal business days; delay in receipt of our compensation; and the extent to which we were at risk in being paid. When our representation is ended, the firm will determine the amount of the total fees and will send the Representative a final statement. To the extent that HMB's final fee exceeds the total number of hours devoted charged at benchmark billing rates, HMB will consult with the Representative before setting that final fee.

The Hennigan firm represented the Representative during the following years in fifteen separate complex and high-stakes Pool-related liability cases. This Court presided over all the various liability actions, having withdrawn the reference to the bankruptcy court for that purpose. Throughout the litigations, the Representative paid all expenses, retained numerous experts, paid another major law firm to assist, and paid the Hennigan firm over $26 million in hourly-rate fees. Eventually, all the liability claims were settled for about $865 million.

Before the 1996 retainer agreement, the Hennigan firm had suggested a contingency fee representation. The Representative declined, noting the County had earlier rejected a proposed contingency fee. In 1997, the Hennigan firm asked the Representative and the Pool Participants if they were willing to change the fee agreement to a contingency fee. They declined. In 1998 the Hennigan firm told the Representative it believed a total fee of 10% of the recovery would be a reasonable fee. The Representative and Pool Participants replied that the suggested fee was too high.

At the end of the litigations in 1999, based on its interpretation of the retainer agreement, the Hennigan firm requested a final fee of $48,718,906 more than it had already been paid, for a total fee of $75,053,450.[1] The firm gave the Representative extensive reasons why it thought the fee was appropriate. The Representative, asserting any final enhanced fee was in his sole discretion, rejected the final fee request. Based on an extensive statement of reasons, he determined the Hennigan firm was adequately compensated by the over $26 million hourly rate fees already paid.

---

1. The firm calculated its fee by multiplying its hourly rate "benchmark" fee by a 2.85 "lodestar multiplier." The "lodestar multiplier" method starts with a "lodestar," or hours worked multiplied by hourly rate. The lodestar is then multiplied by a multiplier, chosen by analyzing the circumstances of the litigation, including factors like the ones listed in the retainer agreement.

When the parties failed to reach agreement on the final fee, the Hennigan firm filed this application for an order determining and awarding a final fee to Hennigan, Mercer & Bennett. The Representative and the County opposed. The Pool Participants intervened in the case also to oppose the Hennigan firm's request.[2]

## II. *DISCUSSION*

### A. *11 U.S.C. § 330*

■ Responding parties argue this application really amounts to a fee petition under 11 U.S.C. § 330 and should be governed by the procedures and other provisions of that section. The Court finds those provisions do not · govern because § 330 does not apply to the application.

The pending bankruptcy case is under chapter 9 of the Bankruptcy Code (municipality bankruptcies). Section 103(e) of the Bankruptcy Code provides that, "[e]xcept as provided in section 901 of this title, only chapters 1 and 9 of this title apply in a case under such chapter 9." Section 901 lists a number of sections which apply to chapter 9 cases, including several sections in chapter 3, but § 330 from chapter 3 is not among them. Because the statute excludes § 330 from the list of statutes applicable to chapter 9 cases, it does not apply here.

### B. *Cal.Bus. & Prof.Code § 6201*

Responding parties argue this motion is not properly before the Court because the Hennigan firm did not comply with the requirement for proper notice to its clients of the right to arbitrate fee disputes. Cal. Bus. & Prof.Code § 6201. However, that section provides a court action will only be stayed if a client actually files a request for arbitration, and failure to file is deemed a waiver. Here, arbitration has not been requested.

At oral argument the Representative acknowledged that arbitration is not desired, so the issue is moot.

### C. *Jurisdiction and most appropriate forum*

■▪ Responding parties contend this issue should be decided in the bankruptcy court. The Court disagrees, and will decide it in this Court.

The Ninth Circuit has held that "[d]etermining the legal fees a party to a lawsuit properly before the court owes its attorney, with respect to work done in the suit being litigated, easily fits within the concept of ancillary jurisdiction." *Curry v. Del Priore*, 941 F.2d 730, 731 (9th Cir. 1991). *See also Cammermeyer v. Perry*, 97 F.3d 1235, 1238 (9th Cir.1996); *Carter v. Veterans Administration*, 780 F.2d 1479, 1481 (9th Cir.1986); *Williams v. Alioto*, 625 F.2d 845, 848 (9th Cir.1980), cert. denied, 450 U.S. 1012, 101 S.Ct. 1723, 68 L.Ed.2d 213 (1981); *In re Air Passenger Computer Reservations Systems Antitrust Litigation*, 724 F.Supp. 744, 746 (C.D.Cal. 1989) (ancillary jurisdiction over attorneys' fees extends to contractual disputes over those fees).

There is no contention the various actions brought by the Hennigan firm were improperly before this Court, nor has any argument been made that distinguishes this dispute from any other fee dispute following a civil action. It is appropriate for this Court to retain jurisdiction over the fee application.

The fee request turns .in part on the benefits and difficulties in prosecuting actions to recover Investment Pool losses and the results achieved by the Hennigan firm. Because this Court presided over the litigation at issue, it is most familiar with the issues and results of that litigation. This Court is in a better position

---

**2.** The Court will refer to the parties opposing this fee application (Litigation Representative, the County of Orange, and the Investment Pool Participants) together as the "responding parties." It was initially asserted that not all interested parties were before the Court, but, with the intervention of the Pool Participants, that assertion was withdrawn.

than the bankruptcy court to evaluate the Hennigan firm's litigation performance.

Responding parties argue that, since there was a general reference to the bankruptcy court of all matters relating to the Orange County bankruptcy case, the reference should not be withdrawn for this application unless there is "cause shown" under § 157(d). However, this fee dispute is ancillary to this Court's jurisdiction over liability litigation by the County and Representative against third parties. The reference has already been properly withdrawn for those lawsuits, and so it is already "withdrawn" for this ancillary dispute. It is not necessary or appropriate to "withdraw" the matter a second time for this fee dispute.

■ Even if § 157(d) did apply, withdrawal of the reference on the Court's own motion would be appropriate. This dispute does not arise under Title 11 and is not a "core proceeding" as defined by § 157(b)(2).[3] The main issues are construction of the retainer agreement and the nature of the work done, which are matters best decided in this Court.[4]

This Court has jurisdiction over this application, and is the most appropriate forum to hear it.[5]

## D. *The bankruptcy court's injunction*

To support its fee claim, the Hennigan firm has filed a purported Notice of Lien on the $865 million settlement proceeds it helped recover.[6] Responding parties ar-

gue the lien violates an injunction issued by the bankruptcy court against assertion of equitable liens in the litigation proceeds. That injunction, however, applies only to holders of a "debt or liability that would be discharged pursuant to the terms of the Plan or upon confirmation of the Plan or upon the Effective Date of the Plan under the provisions of the Bankruptcy Code." Order Confirming Second Amended Plan, p. 16, ¶ 10. The Hennigan firm's fee is governed by the retainer agreement and is not the sort of debt or liability addressed by the Plan's injunction. The injunction does not apply to the Hennigan firm's purported lien.

## E. *Discovery*

In the initial briefing, the Representative suggested discovery is needed on this application. At the oral argument, however, both the Representative and the Pool Participants reported that further briefing and declarations had eliminated the need for more discovery.

At oral argument, the County maintained discovery was appropriate, but was unable to state any topic on which discovery was needed.

The Court concludes there is no meaningful request for discovery or apparent need for it.

## F. *Jury trial*

■ The responding parties argue there must be a jury trial of this fee dispute.

---

3. The responding parties argue this is a "core proceeding" because it will affect the amount distributed under the bankruptcy Plan. While the Court's decision on this application will have an effect on the funds distributed under the bankruptcy Plan, that effect is incidental to the decision. To the extent such an effect might be relevant, this Court is sufficiently familiar with the Plan to consider its importance in deciding this application.

4. Under 28 U.S.C. § 157(c)(1), the Bankruptcy Court might be able to hear this application and then submit proposed findings to this Court for review and final judgment. But, since this Court is the more appropriate fo-

rum to decide the matter, judicial economy is better-served by hearing and deciding the application here.

5. The Representative appears to suggest this Court abstain in favor of state court resolution of this application. He offers no authority to support this proposition, nor any reason why a state court would be a more appropriate forum. The Court declines to abstain.

6. No motion has been made to void this purported lien, and the Court expresses no opinion on its legal validity.

The Court finds a jury trial is not necessary.

The Seventh Amendment right to a jury trial applies to "suits at common law" but not to suits "where equitable rights alone were [historically] recognized." *Ross v. Bernhard*, 396 U.S. 531, 533, 90 S.Ct. 733, 735, 24 L.Ed.2d 729 (1970).

■ Ancillary jurisdiction over attorney fees in an underlying action is usually an "equitable" matter:

> Allowance of attorney's fees is part of the historic equity jurisdiction of the federal courts, and the district court [can] properly retain jurisdiction to determine appropriate attorney's fees ancillary to the case.

*Schmidt v. Zazzara*, 544 F.2d 412, 414 (9th Cir.1976) (citations omitted).

Though it has been held that contract disputes can be considered as ancillary matters under a court's "equitable jurisdiction" over attorneys' fees, *In re Air Passenger Computer Reservations Systems Antitrust Litigation*, 724 F.Supp. 744, 746 (C.D.Cal.1989), a court's assertion of jurisdiction does not eliminate the right to a jury trial on traditional matters at law. In *Ross, supra*, 396 U.S. at 537–38, 90 S.Ct. at 738, the Supreme Court held that, even when an action mixes legal and equitable claims, the right to a jury trial for the legal claims cannot be denied. Whether a right to jury trial exists "depends on the nature of the issue to be tried rather than the character of the overall action." *Id.* To determine whether an issue is "legal" or "equitable" courts must consider "first, the pre-merger custom with reference to such questions; second, the remedy sought; and, third, the practical abilities and limitations of juries."[7] *Id.* at n. 10.

■ Although determination of appropriate attorney fees after an underlying action is traditionally an equity matter, contract disputes are traditionally matters at law, even when between an attorney and client. In *Simler v. Conner*, 372 U.S. 221, 83 S.Ct. 609, 9 L.Ed.2d 691 (1963), the Supreme Court addressed this issue in the context of a contingent fee agreement between an attorney and a client. The attorney had originally taken a successful will contest case under a contingent fee agreement providing for a "reasonable" fee to be determined at a court trial. Later, after a setback in the trial court, the attorney had demanded a new fee agreement for half the recovery. The client argued the second agreement was fraudulent, and only the first agreement was enforceable.

After first finding federal law, not state law, controlled the right to a jury trial, the Supreme Court held:

> [t]he case was in its basic character a suit to determine and adjudicate the amount of fees owing to a lawyer by a client under a contingent fee retainer contract, a traditionally 'legal' action.

*Id.*, 372 U.S. at 223, 83 S.Ct. at 611. As a result, the case presented "traditional common-law issues which can be and should have been submitted to a jury." *Id.*

Many courts have distinguished *Simler*, stating either that it applies only to contingent fee agreements or that it applies only in declaratory judgment actions. *See, e.g., McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1314 (2nd Cir.1993) ("the Supreme Court has not extended the right to a jury trial as to the amount of attorneys' fees beyond the limited context of a dispute about a contingent fee contract."); *Petition of Rosenman & Colin*, 850 F.2d 57, 60 (2nd Cir.1988) (distinguishing *Simler* as

---

7. The third *Ross* factor has been indirectly questioned by the Ninth Circuit and other courts in recent years. *See, e.g., Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir.1985), *superseded in part by statute*, 28 U.S.C. § 1961 (there is "no complexity exception to the Seventh Amendment right to jury

trial"). Because *Ross* suggests the first factor is the most important, later cases which give little weight to the second and third factors do not necessarily contradict its holding. *Ross, supra*, 396 U.S. at 538, n. 10, 90 S.Ct. at 738, n. 10.

applicable only to declaratory judgment actions).

What may be the best explanation of the *Simler* holding is found in *Ginberg v. Tauber*, 678 A.2d 543, 550 (D.C.1996):

> *Simler* does no more than hold that when there is a factual dispute concerning which attorneys' fee contract applies to a transaction, a party is entitled to have a jury resolve that "at law" factual question.

A jury trial was thus appropriate in *Simler* to determine the factual question of the second fee agreement's validity.

A different situation was presented to the Second Circuit in *Rosenman & Colin, supra.* In that case, a client argued she was entitled to a jury trial because the proceeding was "essentially a contractual dispute over an attorney's fee." *Id.,* 850 F.2d at 60. The court disagreed, finding it was "an action to enforce a lien" and therefore was "inherently equitable." *Id.* The court noted "[n]o jury is available notwithstanding that traditionally legal issues are raised, such as the contractual liability giving rise to the lien." *Id.* at 60–61. Because the suit centered around the lien, the court found it to be a matter of equity.

The Ninth Circuit has not addressed the lien issue presented in *Rosenman & Colin.* It is not necessary, however, to determine how the Ninth Circuit would decide that case because the situation here is distinguishable. The Hennigan firm's purported equitable lien on the litigation proceeds was filed after this fee application and is entirely dependent on the result of this application. The application is not based on the lien; it is based on the fee agreement.

In the case at bar, this Court determines the legal interpretation and effect of the language in an admitted fee agreement, and an appropriate fee under the agreement and the legal rules governing attorneys fees. Under applicable case law, both of these are matters for the court. No jury trial is needed.

## G. The Representative's discretion

■ The Representative does not have sole discretion to determine a final fee for the Hennigan firm.

Both the Plan and the bankruptcy court's Confirmation Order give the Representative broad authority to act concerning Pool-related claims. He is the successor-in-interest to the claims and has the same rights concerning their prosecution as if they were his own. The plan provided:

> "The Representative's authority shall include determining whether, and on what terms, to enforce, prosecute, collect, settle or abandon any or all of such Pool–Related Claims.... The Representative is authorized to use the Litigation Fund and the Litigation Proceeds as the Representative deems appropriate to enforce, prosecute and collect upon Pool–Related Claims ... including, without limitation, to pay for the services of attorneys...."

The first passage confirms the Representative's authority to make decisions about prosecuting the Claims. The second passage discusses the Representative's power to retain and pay attorneys. Under this authority, the Representative made a valid contract with the Hennigan firm. The firm agreed to represent the Representative in the Pool-related liability litigation, and the Representative agreed to pay the Hennigan firm for its services. The amount of the agreed-upon payment is the subject of this application, but both sides agree that compensation was due the Hennigan firm under the fee agreement.[8]

---

8. Responding Parties do not contest the validity of the over $26 million in hourly rate charges already paid to the Hennigan firm. These payments were made on a monthly basis throughout the litigation in response to bills from the firm. The Hennigan firm's hourly rates were raised three times during the representation with the agreement of the Representative.

The responding parties argue that, under the Plan and the bankruptcy court's Confirmation Order, the Representative has the sole discretion to determine any enhanced fee for the Hennigan firm. They contend this discretion continues after making the retainer agreement. In support of this argument, responding parties cite language from the Plan giving the Representative "sole and absolute discretion in all matters concerning the ... Pool–Related Claims." They argue the Representative did not, and legally could not, delegate this "sole" discretion to the Hennigan firm to set its own compensation.

The Court concludes the Representative did not "delegate" his discretion to the Hennigan firm in the retainer agreement. The language cited by the responding parties gives the Representative authority and discretion to hire attorneys for the Pool liability claims, and contract for those attorneys' compensation. The Representative exercised this discretion by agreeing to a valid retainer contract with the Hennigan firm. Now, the Representative is bound by the agreement. At oral argument, the responding parties acknowledged the Representative has no authority unilaterally to abrogate the contract. None of the passages quoted by the responding parties give the Representative power unilaterally to change the contract terms.

The Plan's and the Confirmation Order's emphasis on the Representative's discretion is an affirmation of his status as the successor-in-interest to the Pool Participants' claims. He is charged and entrusted with the discretion that these parties would generally have to direct the litigation themselves. The references to discretion give the Representative authority to act on the Pool Claims and confirm his independence of judgment from the Pool Participants.[9] The Representative could enter into a fee agreement, and manage the litigation as would any other client. He does not have sole discretion to determine if an enhanced fee should be paid.

The Court finds the retainer agreement did not delegate any of the Representative's "discretion," within the meaning of that term in the Plan, to the Hennigan firm. The Representative's discretion was exercised when he signed the fee agreement. The retainer agreement's compensation method is not changed by the fact the Representative's authority to contract arises from a broad "discretion" in a bankruptcy plan.

## H. California's Constitution and statutes

■ Orange County contends any contract specifying hourly rate billings, but providing for possible increase after performance, is an improper attempt to circumvent the California Constitution's restriction of after-the-fact bonuses by public agencies. Cal.Constitution, Article 11, § 10(a). The responding parties assert that, if the retainer agreement is interpreted to remove the sole discretion of the Representative over the Hennigan firm's final fee, it would violate the California Constitution's Article 14, § 6 prohibition against gifts of public funds.

Neither constitutional provision is violated by the retainer agreement or the construction of it that the Court will enforce. The agreement does not call for a "bonus," but provides for a contracted calculation of a fee based on well-recognized standards, even though calculated at the end of the representation. 73 Ops.Cal.Atty.Gen. 296 (1990); *Jarvis v. Cory*, 28 Cal.3d 562, 570, 170 Cal.Rptr. 11, 620 P.2d 598 (1980). There will be no "gift" of public money,

9. The discretion language appears at the end of a full page discussion of the Representative's and the County law firm's duties to communicate with Pool Participants' counsel. It asserts the Representative's ultimate independence from the Pool Participants, despite the duty to communicate.

but a payment of a lawful contractual obligation.[10]

■ The responding parties assert the fee agreement is voidable because it does not meet the requirements of California Business and Professions Code § 6147. That section applies to contingency fee agreements. *Franklin v. Appel*, 8 Cal. App.4th 875, 879, 10 Cal.Rptr.2d 759 (1992). In this case, the subject contract is construed by the Court not to be a contingency fee agreement, but a contract for a fee based on specific hourly billing rates, subject to adjustment under enumerated factors. This contract complies with California Business and Professions Code § 6148.

### I. Application of the parties' fee contract

■ The Court construes the parties' retainer agreement, and its attorney fee provisions, under ordinary rules of attorney fee contract interpretation. A primary rule of such construction is that attorney fee contracts must be fair and reasonable, and such contracts are strictly construed against the attorney. *Alderman v. Hamilton*, 205 Cal.App.3d 1033, 1037, 252 Cal.Rptr. 845 (1988).

The parties entered into a lawful retainer agreement, containing a lawful provision for payment of attorney fees. That fee agreement provides for an attorney fee based on fixed "benchmark" hourly billing rates, subject to adjustment down or up at the end of the representation based on

results accomplished and other listed criteria.[11]

■ Any lack of specificity in the agreement's language as to the method of fee calculation must, under the law, be construed against the attorneys.

### 1. Multiplier method not appropriate here

■ In calculating its final bill, the Hennigan firm applied a "lodestar multiplier" of 2.85 to the hourly fees it had already been paid. It calculated that the appropriate fee under the contract was almost $49 million more than it had already been paid, for a total of over $75 million.

At the outset of this motion, the Hennigan firm took the erroneous position that both the retainer agreement and the law require use of a multiplier in determining the contract fee. Firm's motion, pp. 9–10. By the time of oral argument, the firm had withdrawn from that position, and acknowledged that multiplier calculation is not required. The firm argued, however, that the multiplier calculation method should be selected as the most reasonable method of calculation. The Court disagrees, and finds the multiplier method is not appropriate here.

California cases cited by the Hennigan firm as using a multiplier are distinguishable from this case. For example, the *Press* and *Serrano* courts used multipliers to award fees in "private attorney general"

---

10. The Court takes judicial notice of the fact incentive award payments are not unusual in government. *See, Report on the Federal Incentive Awards Program for Fiscal year 1996*, published by the United States Office of Personnel Management, reporting about 36 incentive awards for superior performance were paid per 100 employees in 1996. California has a similar performance-based awards system.

11. The fee agreement is not just a contract for an hourly rate fee, as originally contended by the responding parties. It provides to the contrary on its face. It specifies the Hennigan firm charges based on the hourly rate

plus other factors, "the fees charged will not necessarily be equal to the benchmark rates multiplied by the hours spent," and at the end of the representation "the amount of the total fees" may "exceed" the hourly rate. At oral argument the Representative acknowledged the agreement provided both the attorneys and he could have some flexibility to adjust the fees, either down or up, depending on circumstances.

This is not a "reasonable fee" case or a contract for "a reasonable fee." It is a contract based on a legally sufficient, mutually agreed standard of compensation.

cases where the plaintiffs had sued to enforce constitutional rights.[12] California law does require the use of the lodestar multiplier calculation method in fee awards under the private attorney general statute, § 1021.5. *See Press,* 34 Cal.3d at 322, 193 Cal.Rptr. 900, 667 P.2d 704. Many lower California courts have also adopted the lodestar multiplier method to determine fees under other fee-shifting statutes.[13] However, the California Supreme Court has not spoken on the issue, and the California Courts of Appeal have declined in many instances to use the multiplier in other situations.[14]

Federal courts have more narrowly limited the use of the lodestar multiplier method than have California courts. Under federal law, an attorney's hourly rate is presumptively a reasonable fee for services, even for civil rights cases. *See Blum v. Stenson,* 465 U.S. 886, 898–901, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Jordan v. Multnomah County,* 815 F.2d 1258, 1262 (9th Cir.1987). A court may adjust an hourly-rate fee, but only in extraordinary circumstances. *See Blum,* 465 U.S. at 898–901, 104 S.Ct. 1541.[15] Each enhancing factor is to be considered only once, either in setting the hourly rate or in adjusting it. *See id.* at 898–99, 104 S.Ct. 1541.[16]

The fact that the agreement lists factors often used by courts to determine a multiplier does not call for use of the multiplier method in this case. Variations on the enumerated factors are often used as common-sense tests of reasonable rates and fees. They are not unique to multiplier calculations, and are frequently used in other contexts. *See, e.g., Clayton Development Company, Inc. v. Falvey,* 206 Cal. App.3d 438, 447, 253 Cal.Rptr. 609 (1988) (The reasonableness of attorneys' fees depends on several factors, including "the nature of the litigation, its difficulty, the amount involved, the skill required and the skill employed in handling the litigation, the attention given, the success of the attorney's efforts, his learning, his age, and his experience in the particular type of work demanded; the intricacies and importance of the litigation, the labor and the necessity for skilled legal training and

---

**12.** *See Press v. Lucky Stores, Inc.,* 34 Cal.3d 311, 193 Cal.Rptr. 900, 667 P.2d 704 (1983) (awarding fees under California's private attorney general statute, Cal.Code of Civ.Proc. § 1021.5); *Serrano v. Priest,* 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303 (1977) (awarding fees to plaintiffs challenging California school-funding scheme as unconstitutional, later codified by California's private attorney general statute).

**13.** *See Weeks v. Baker & McKenzie,* 63 Cal. App.4th 1128, 1172, 74 Cal.Rptr.2d 510 (1998) (citing various cases using the lodestar multiplier method under different statutes); *Flannery v. California Highway Patrol,* 61 Cal. App.4th 629, 640–42, 646–47, 71 Cal.Rptr.2d 632 (1998) (allowing use of lodestar multiplier in FEHA case, and listing other cases which have applied a multiplier under different statutes).

**14.** *See, e.g., Flannery,* 61 Cal.App.4th at 640, 71 Cal.Rptr.2d 632 (regarding the California Supreme Courts lack of ruling on this issue); *Montgomery v. Bio–Med Specialties, Inc.,* 183 Cal.App.3d 1292, 1297, 228 Cal.Rptr. 709 (1986) (rejecting the "application of the [lodestar multiplier] concept to attorney fee awards outside the context of public interest litigation" and finding "*Serrano III* and its progeny represent somewhat of a deviation from the general rule allowing the trial court wide latitude in determining the amount of an award of attorney's fees.") (citing *Fed–Mart Corp. v. Pell Enterprises, Inc.,* 111 Cal.App.3d 215, 168 Cal.Rptr. 525 (1980)).

**15.** Many of the cited cases involve civil rights attorney fees awards. The same lodestar method applies to other non-civil rights, fee-shifting statutes as well, and federal courts may even be stricter about departing from the hourly-rate fee in these cases. *See, e.g., In re Manoa Finance Co., Inc.,* 853 F.2d 687 (9th Cir.1988) (denying enhancement of the lodestar in a Bankruptcy § 330 attorneys' fee award); *In the Matter of UNR Industries, Inc.,* 986 F.2d 207 (7th Cir.1993) (denying enhancement under § 330).

**16.** The California Court of Appeals has also held "the same factors which led the court to award fees may not also be used as justification for enhancing the fee award." *Weeks v. Baker & McKenzie,* 63 Cal.App.4th at 1171, 74 Cal.Rptr.2d 510 (1998).

ability in trying the cause, and the time consumed.") (quoting *Clejan v. Reisman,* 5 Cal.App.3d 224, 241, 84 Cal.Rptr. 897 (1970) (quoting *Berry v. Chaplin,* 74 Cal. App.2d 669, 679, 169 P.2d 453 (1946))); *City of Oakland v. Oakland Raiders,* 203 Cal.App.3d 78, 82–84, 249 Cal.Rptr. 606 (1988) (considering, in addition to the hourly rate, "the extraordinary novelty and complexity of the issues presented, the need for the Raiders' counsel to act quickly throughout the litigation, the deferral of payment of counsel's fees, and most significantly the critical importance of the litigation to the Raiders and the result obtained," but not using a multiplier); *Mandel v. Hodges,* 54 Cal.App.3d 596, 623, 127 Cal.Rptr. 244 (1976) (citing *Los Angeles v. Los Angeles–Inyo Farms Co.,* 134 Cal.App. 268, 276, 25 P.2d 224 (1933)) (giving essentially the same factors as *Clayton Development, supra* ).

In this case, the parties' contract makes no mention of a multiplier. It gives no indication of the potential magnitude of difference between the hourly rate and the final fee that a multiplier would create. It merely provides the final fee will be based on the "benchmark" hourly rates with possible adjustment.

A "benchmark" is a standard unit for basis of comparison, or a standard or point of reference in measuring or judging quality or value, or a point of reference from which measurements may be made. By using "benchmark" to define the hourly rate, without any reference to a multiplier or huge magnitude leap to a final fee, the reasonable interpretation of the contract language is that the hourly rate is a rough approximation of what the final fee will be. The final fee may be adjusted based on other listed factors, but any differential would be fairly close to the hourly rate.[17]

Strictly construing the contract against the attorneys as the law requires, the Court holds the correct construction of the contract is that the final fee will be in the same general order of magnitude as the hourly "benchmark" fee. Without a specific agreement to do a major adjustment, the agreement only authorizes a minor adjustment.[18]

### 2. *Determination of appropriate fee*

■ The factors listed in the parties' contract are appropriate to consider in determining the appropriate contractual final fee. Each of the factors has been discussed at length by the parties, and has

17. In this case, the County and the Representative rejected a contingency fee arrangement several times. Use of a multiplier here would convert the contract into a "quasi" contingency fee arrangement. Presumably, the Representative and County had a good reason for resisting a contingency fee, thinking they would come out ahead financially by having a contract based on hourly rates. It would be inappropriate now to deprive a contracting party of the benefit of its bargain, and establish a fee structure that would be tantamount to a contingency fee.

18. In seeking a massive fee increase, the Hennigan firm subscribes to a flawed and cynical philosophy. In support of a multiplier, the firm argues:

"If lawyers in cases like these are paid only their 'straight hourly rates,' they have less reason to maximize results for clients or to expedite resolution. Appropriate, retrospective adjustments give lawyers the opportunity to fashion creative, resourceful methods to end cases profitably and well."

This concept is contrary to a lawyer's oath and duty to the client and the profession. To imply that lawyers might be justified in doing less than their best when paid only "straight hourly rates" is repugnant. Lawyers are obliged to do their best for their clients whatever the fee arrangement, and are duty-bound to maximize results and expedite resolution. Anything less would be unethical and dishonorable.

The irony of this argument is that the lodestar multiplier fee calculation method does not tend to expedite resolution, but has the opposite effect. *See, In re Quantum Health Resources, Inc., Securities Litigation,* 962 F.Supp. 1254, 1256–57 (C.D.Cal.1997) (collecting cases criticizing the lodestar multiplier method.) As this Court noted in *Quantum,* "[t]he lodestar [multiplier] method ... creates an incentive to keep litigation going in order to maximize the number of hours included in the ... lodestar calculation." *Id.* at 1256.

**224**

been reviewed and evaluated by the Court. They will not be repeated in detail.[19]

The Orange County bankruptcy liability cases were unique and complex. Large amounts were at issue, and extensive excellent opposition was encountered. A high degree of skill was expected from the Hennigan firm, and its hourly rates reflected that expectation. The case ranged through wide locales and had extended schedules.

For plaintiff business litigators, this was a "dream case," by which to define a career. The issues were novel, the stakes were high, the opponents' pockets were deep, the work was steady and extended over years, and the firm was fully involved for as many hours as could be made available. All expenses were paid, there was a huge fee fund to bill against, all fees were promptly paid in full, there was no risk of delay or non-payment, and the publicity exposure for a new lawfirm was exceedingly high.

The legal results were mixed. On motions and issues presented for decision, the Hennigan firm won some and lost some. But, as the Representative and Pool Participants acknowledge, the final result was excellent and exceeded their expectations.[20]

Aside from the factor of the results accomplished, the other factors are already accounted for to a degree in the high hourly rates paid the Hennigan firm. The Representative hired top attorneys and paid top dollar for them. Excellence was expected. However, since the parties' contract enumerates these factors as appropriate consideration for a final fee adjust-

ment, they are correctly considered to that further degree.

Based on all these considerations, and construing the contract against the attorneys as it is obliged to do, the Court finds the appropriate interpretation of the parties' contract is an upward adjustment of the "benchmark" hourly-rate fees already paid to the Hennigan firm. The Court finds an additional $3 million is now payable to the Hennigan firm, without interest before the date of this Order.

---

**19.** It is proper to note that public money is at stake, and any enhancement will ultimately fall on the taxpayers. *Serrano v. Priest*, 20 Cal.3d 25, 49, 141 Cal.Rptr. 315, 569 P.2d 1303; *Meister v. Regents of the University of California*, 67 Cal.App.4th 437, 447 n. 8, 78 Cal.Rptr.2d 913 (1998). However, that doesn't influence the outcome in this contractual fee case. A public entity, like any other

contracting party, is bound by the terms of its contract.

**20.** The *gross* loss under the Treasurer's investment scheme was about $1.6 billion, but, after off-setting the profit the Treasurer had earlier made under the scheme, the *net* loss was arguably less than $900 million. The Hennigan firm's litigations recovered $865 million.