[No. C051270. Third Dist. Oct. 19, 2006.]

COUNTY OF COLUSA, Cross-complainant and Respondent, v. CALIFORNIA WILDLIFE CONSERVATION BOARD et al., Cross-defendants and Appellants.

638

640

**COUNSEL**

Bill Lockyer, Attorney General, Mary E. Hackenbracht, Assistant Attorney General, and Deborah A. Wordham, Deputy Attorney General, for Cross-defendants and Appellants.

Somach, Simmons & Dunn, Timothy M. Taylor and Henry Rodegerdts for Cross-complainant and Respondent.

**OPINION**

**CANTIL-SAKAUYE, J.**—The California Department of Fish and Game (DFG) through the California Wildlife Conservation Board (WCB) (together, the State Agencies) proposes to convert an area of agricultural land in Colusa County into wildlife habitat. The State Agencies' actions relating to this project were challenged in court as violating the California Environmental

Quality Act (CEQA)[1] (Pub. Resources Code, § 21000 et seq.), the Williamson Act (Gov. Code, § 51200 et seq.),[2] and Colusa County's general plan and zoning ordinances. In this appeal we consider the State Agencies' appeal from a judgment for attorney fees in favor of Colusa County (County) pursuant to Code of Civil Procedure section 1021.5 on the County's Williamson Act claims. We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Leroy Traynham (Traynham) is the owner of 235 acres of farmland (the property) located in Colusa County. The property is located in the "Agriculture-General" land use designation of the County's general plan and is zoned "Exclusive Agriculture."[3] In 2000 Traynham and the County entered into a Williamson Act contract limiting use of the property to agriculture and compatible uses. (§ 51200 et seq.)[4] A short time later, Traynham entered into a farmland security zone contract (Super Williamson Act Contract) with the County for the property. (§ 51290 et seq.)[5] The Super Williamson Act contract specifically limited use of the property to "production of food and fiber for commercial purposes and uses compatible thereto." The contract listed all such compatible uses in an attached exhibit, which list did not include use of the property as a wildlife refuge or managed wetlands.

In 2001, the DFG, through the WCB, negotiated with Traynham for the purchase of a conservation easement (easement) on Traynham's property

---

[1] The WCB's approval of this project as exempt from CEQA was the subject of a related appeal in this court. (*California Farm Bureau Federation v. California Wildlife Conservation Bd.* (2006) 143 Cal.App.4th 173 [49 Cal.Rptr.3d 169].)

[2] Hereafter, undesignated statutory references are to the Government Code.

[3] The County's general plan provides land carrying the Agriculture-General designation "is generally used for orchard and crop production." Agriculture-General areas zoned "Exclusive Agriculture" are areas with agriculture as the primary use of the property.

[4] The California Land Conservation Act of 1965 (§ 51200 et seq.), also known as the Williamson Act, authorizes local governments to establish "agricultural preserves" consisting of lands devoted to agricultural and other compatible uses. (§ 51230; see *Sierra Club v. City of Hayward* (1981) 28 Cal.3d 840, 850 [171 Cal.Rptr. 619, 623 P.2d 180], superseded by statute as stated in *Friends of East Willits Valley v. County of Mendocino* (2002) 101 Cal.App.4th 191, 204 [123 Cal.Rptr.2d 708].) Once a preserve is established, the local government may enter into renewable contracts with owners of included agricultural land to restrict the use of the land for at least 10 years in exchange for favorable statutory property tax assessment standards. (§§ 51240, 51242, 51244.)

[5] The Legislature in 2000, in an effort "to expand options available to landowners for the preservation of agricultural land" and "to encourage the creation of longer term voluntary enforceable restrictions within agricultural preserves" (§ 51296), added statutory provisions allowing rescission of Williamson Act contracts and simultaneous placement of the land in new farmland security zone contracts with an initial term of 20 years. (§ 51296 et seq.)

to create a managed wildlife habitat on the property as the first acquisition/restoration project under the California North Central Valley Conservation Reserve Enhancement Program. The easement agreement prohibited in perpetuity the cultivation on the property of agricultural crops for commercial gain as a generally inconsistent use of the property.

On January 22, 2002, the WCB sent a letter to the County's board of supervisors informing the County it was "involved in a conservation easement and restoration program that is focused on the long-range protection and restoration of habitat for fish and wildlife." As part of this program, the WCB was considering acquisition of an easement over Traynham's property and that it proposed to restore the property to approximately 130 acres of seasonal wetlands, 15 acres of brood ponds and 80 acres of uplands. Labeled the "Traynham Ranch project," it was scheduled to be considered at the February 27, 2002 meeting of the WCB.

On January 28, 2002, the WCB sent a memo to the California Department of Conservation describing the Traynham Ranch project. As relevant here, the memo took the position section 51292 of the Williamson Act, which requires specific findings before a public agency can locate a public improvement on land covered by a Williamson Act contract,[6] did not apply to this project because the project came within one of the exceptions to section 51292 provided in section 51293. The memo also took the position the project was exempt from environmental review under CEQA. The Department of Conservation forwarded the memo to the California Department of Food and Agriculture.

At its public meeting held on February 27, 2002, the WCB approved the easement agreement and accompanying site-specific waterfowl habitat management plan (management plan), which identified the measures needed to convert the property from agriculture to habitat. A notice of exemption was filed asserting the Traynham Ranch project was exempt from CEQA under class 13 of the CEQA Guidelines. (Cal. Code Regs., tit. 14, § 15313.)

The Department of Food and Agriculture responded to the Department of Conservation regarding the WCB's Traynham Ranch project on February 28, 2002. The Department of Food and Agriculture took the position the project was not exempt either from the findings requirement of section 51292, as the statutory exception relied upon by the WCB was inapplicable, or from CEQA.

---

[6] Section 51292 provides, "No public agency or person shall locate a public improvement within an agricultural preserve unless the following findings are made: [¶] (a) The location is not based primarily on a consideration of the lower cost of acquiring land in an agricultural preserve. [¶] (b) If the land is agricultural land covered under a contract pursuant to this chapter [(the Williamson Act)] for any public improvement, that there is no other land within or outside the preserve on which it is reasonably feasible to locate the public improvement."

At the end of March 2002, the WCB met with the County to discuss the Traynham Ranch project. The WCB expressed its opinion that the Traynham Ranch project would be a compatible use under the Super Williamson Act Contract on the property. The County disagreed and, in turn, expressed its CEQA and Williamson Act compatible use concerns.

On March 29, 2002, the California Farm Bureau Federation and the Colusa County Farm Bureau (together the Farm Bureau) filed a petition for writ of mandamus and injunctive relief against the WCB and the DFG alleging violations of CEQA and the Williamson Act.[7] The petition named as real parties in interest the County, Traynham, and the California Waterfowl Association (the organization responsible for much of the actual work necessary to convert the property into habitat). With respect to the Williamson Act, the Farm Bureau's petition alleged the State Agencies failed to give notice to the County in compliance with section 51291, the State Agencies did not and could not make the findings required under section 51292, and the Traynham Ranch property was not eligible for conversion to wildlife habitat while encumbered with the Super Williamson Act Contract. The petition alleged the easement agreement was not a compatible use with the Super Williamson Act Contract on the property.

Within a few days of the meeting with the County and the Farm Bureau's filing of the lawsuit, the DFG and the WCB exchanged e-mails regarding whether the easement could be amended to allow some limited grazing of livestock on the property as a type of agricultural use. Apparently referencing some written 1990's studies and articles about grazing benefits on wetlands, the WCB suggested allowing grazing on wetland easements, including on Traynham's property, might be "good business for us, regardless of the lawsuit." However, the record does not contain any evidence the DFG and the WCB pursued the matter further at this point.

On July 2, 2002, the County filed a cross-petition for writ of mandate and a cross-complaint against the DFG, the WCB and Traynham. The first cause of action alleged Traynham acted inconsistently with and in breach of the Super Williamson Act Contract by granting the easement to the state. The County sought an order entitling the County to reassess the property at full cash value and an order requiring specific performance of the contract or an injunction preventing Traynham from using his property as an easement. The second cause of action alleged the State Agencies failed to follow the notice

---

[7] The Farm Bureau's petition is not part of this record on appeal. However, we take judicial notice of the Farm Bureau's petition in the related appeal as contained in the record on appeal in case No. C049919 (*California Farm Bureau Federation v. California Wildlife Conservation Bd., supra*, 143 Cal.App.4th 173). (Evid. Code, § 452, subd. (d).)

procedures of the Williamson Act and failed to make the findings required by section 51292 prior to approving the acquisition of the easement on Traynham's property for a public use. The County sought a writ of mandate compelling the DFG and the WCB to rescind their approval of the acquisition of Traynham's property and to comply with the procedural requirements of the Williamson Act. In its third cause of action, the County alleged Traynham was required, and failed, to seek a general plan amendment and rezone for his proposed use of the property under the easement. The County sought injunctive relief. In its fourth cause of action, the County alleged the State Agencies acted arbitrarily and capriciously by approving the acquisition of Traynham's property for uses inconsistent with the County's general plan and zoning ordinances. The County sought rescission of the State Agencies' approval and a prohibition of incompatible uses of the property.

The Farm Bureau and the County together filed a motion for preliminary injunction seeking a stay of the State Agencies' underlying administrative decision and an injunction enjoining the State Agencies, Traynham and the California Waterfowl Association from "any site preparation and earth movement, development of habitat water infrastructure, and establishment of habitat vegetation" on Traynham's property. In their accompanying points and authorities, the Farm Bureau and the County argued, as to the DFG and the WCB, that the State Agencies violated CEQA by exempting the project from any environmental review, violated the Williamson Act by failing to provide appropriate notice to the County and by failing to make the findings required by section 51292, and that the State Agencies' approval of the project was inconsistent with the County's general plan and zoning ordinance. The State Agencies opposed the motion, but did not address or contest the claims of their procedural violations of the Williamson Act.[8]

On November 21, 2002, the trial court stayed the underlying administrative decision and issued an injunction as requested. The trial court expressly found the Farm Bureau and the County had "demonstrated that they have a reasonable probability of success on the merits of their claims," that they will suffer irreparable harm if preliminary injunctive relief was not granted, that the balance of equities favored issuance of the preliminary injunction and the stay would not be against the public interest.

On December 6, 2002, Traynham wrote to the DFG regarding the numerous problems the County's lawsuit was causing him. He suggested many of these problems, including the County's allegations of his violation of the

---

[8] We take judicial notice of the State Agencies' opposition to the motion for preliminary injunction. (Evid. Code, § 452, subd. (d); *California Farm Bureau Federation v. California Wildlife Conservation Bd., supra,* 143 Cal.App.4th 173.)

Williamson Act, could be solved by an amendment to the easement and adjustment to the management plan to allow livestock grazing on the property. He proposed specific language for an amendment to the easement. Traynham subsequently presented his proposed amendment, with the apparent agreement of the DFG, to the County. The County rejected Traynham's proposed language, but expressed its willingness to continue to discuss the issue.

At the end of January 2003, the County proposed bifurcation of its first (breach of contract) and third (violation of the County's general plan and zoning ordinance) causes of action against Traynham. On February 28, 2003, the trial court ordered bifurcation and a limited stay of the entire cross-petition and cross-complaint of the County to allow settlement discussions.

The State Agencies became directly involved in negotiating with the County regarding the amendment of the easement in March and April 2003. In early May 2003, the State Agencies accepted the County's proposed amendment language and agreed to execute the amendment with Traynham. The amendment to the easement was executed on May 14, 2003.

On November 10, 2003, the County dismissed without prejudice the first and second causes of action (related to the Williamson Act) in its cross-petition and cross-complaint.

On December 22, 2003, the County filed a motion for attorney fees pursuant to Code of Civil Procedure section 1021.5. The County claimed it had successfully obtained the relief it sought with respect to the Williamson Act and the first and second causes of action, that its lawsuit enforced important public rights benefiting the residents of the County and the state by forcing the State Agencies to honor the Williamson Act mandates, and that the necessity and financial burden of enforcement made an award of fees appropriate. The trial court dismissed the County's motion without prejudice pending the conclusion of the case.

The County and the State Agencies settled the remaining claims of the County's cross-petition and cross-complaint. The County agreed to dismiss its third and fourth causes of action related to general plan and zoning violations against Traynham and the state agencies. Each party agreed to bear its own fees and costs on the third and fourth causes of action. The County resubmitted its motion for attorney fees with respect to its first and second causes of action. Over the opposition of the State Agencies, the trial court granted the County's motion and judgment was entered awarding the County $31,920.25 in fees against the State Agencies. The State Agencies appeal.

## DISCUSSION

## I.

## Overview

■ Code of Civil Procedure section 1021.5 is a codification of the private attorney general doctrine adopted by the California Supreme Court in *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*). (*Press v. Lucky Stores* (1983) 34 Cal.3d 311, 317 [193 Cal.Rptr. 900, 667 P.2d 704] (*Press*); *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200] (*Woodland Hills II*).) "[T]he fundamental objective of the private attorney general doctrine of attorney fees is ' "to encourage suits effectuating a strong [public] policy by awarding substantial attorney's fees . . . to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens." ' [Citation.] The doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible." (*Woodland Hills II, supra*, at p. 933.) Since a 1993 amendment, section 1021.5 has also allowed fees for enforcement of important rights affecting the public interest by one public entity against another public entity. (Stats. 1993, ch. 645, § 2, p. 3747.)

Code of Civil Procedure section 1021.5 provides in relevant part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."[9]

■ The decision whether to award attorney fees under Code of Civil Procedure section 1021.5 rests initially with the trial court. (*Baggett v. Gates* (1982) 32 Cal.3d 128, 142 [185 Cal.Rptr. 232, 649 P.2d 874] (*Baggett*).) Using its " 'traditional equitable discretion,' " the trial court " 'must realistically assess the litigation and determine, from a practical perspective' [citation] whether or not the statutory criteria have been met." (*Ibid.*; see *Families*

---

[9] Subdivision (c) of section 1021.5 is inapplicable here since the County's action did not seek or obtain any monetary recovery.

*Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (2000) 79 Cal.App.4th 505, 511 [94 Cal.Rptr.2d 205] (*Families Unafraid*).) As section 1021.5 states the criteria in the conjunctive, each of the statutory criteria must be met to justify a fee award. (*Punsly v. Ho* (2003) 105 Cal.App.4th 102, 114 [129 Cal.Rptr.2d 89]; see *Arnold v. California Exposition and State Fair* (2004) 125 Cal.App.4th 498, 510 [22 Cal.Rptr.3d 790] [court may deny a section 1021.5 fee request if one of the criteria is not met].)

On appeal, we review the trial court's decision for abuse of discretion. (*Baggett, supra,* 32 Cal.3d at pp. 142–143.) The trial court's determination may not be disturbed on appeal absent a showing that there is no reasonable basis in the record for the award. (*Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641, 1666 [39 Cal.Rptr.2d 189].) "Particularly in a case such as this, fully briefed and argued before the same trial court which heard [the merits], this is not an insignificant point." (*Williams v. San Francisco Bd. of Permit Appeals* (1999) 74 Cal.App.4th 961, 965 [88 Cal.Rptr.2d 565].)

On appeal, "we must pay ' "particular attention to the trial court's stated reasons in denying or awarding fees and [see] whether it applied the proper standards of law in reaching its decision." ' " (*Families Unafraid, supra,* 79 Cal.App.4th at p. 512.) "The pertinent question is whether the grounds given by the court for its [grant] of an award are consistent with the substantive law of [Code of Civil Procedure] section 1021.5 and, if so, whether their application to the facts of this case is within the range of discretion conferred upon the trial courts under section 1021.5, read in light of the purposes and policy of the statute." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1298 [255 Cal.Rptr. 704].)

## II.

### The Trial Court Did Not Abuse Its Discretion in Awarding the County Its Attorney Fees

A. *The County Was the Successful Party on Its Second Cause of Action Against the State Agencies*

A threshold requirement for a fee award under Code of Civil Procedure section 1021.5 is the party seeking fees must be "a successful party against one or more opposing parties in any action." (§ 1021.5; see *Schmier v. Supreme Court* (2002) 96 Cal.App.4th 873, 877 [117 Cal.Rptr.2d 497] (*Schmier*).) "[T]he terms 'prevailing party' and 'successful party,' as used in

section 1021.5, are synonymous." (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 570 [21 Cal.Rptr.3d 331, 101 P.3d 140] (*Graham*).)

In assessing whether a party is a successful party, a "broad, pragmatic view" is applied. (*Graham, supra,* 34 Cal.4th at p. 565.) It is not necessary that the party seeking fees has obtained a final favorable judgment. (*Ibid.*) "The critical fact is the impact of the action, not the manner of its resolution. If the impact has been the 'enforcement of an important right affecting the public interest' and a consequent conferral of a 'significant benefit on the general public or a large class of persons' a [Code of Civil Procedure] section 1021.5 award is not barred because the case was won on a preliminary issue [citation] or because it was settled before trial. [Citation.]" (*Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 685 [186 Cal.Rptr. 589, 652 P.2d 437], fns. omitted.) Plaintiffs may be awarded fees under section 1021.5 if they achieved the relief they sought through a preliminary injunction, even though their action may have become moot. (*Press, supra,* 34 Cal.3d 311, noted with approval in *Graham, supra,* at p. 566; and *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1291 [240 Cal.Rptr. 872, 743 P.2d 932].) The trial court must, in its discretion, "realistically assess the litigation and determine, from a practical perspective, whether or not the action served to vindicate an important right so as to justify an attorney fee award . . . ." (*Woodland Hills II, supra,* 23 Cal.3d at p. 938.)

■ The trial court in this case ruled the County was the successful party in this action because "[a]lthough the County did not compel the State Agencies to comply with [Government Code] § 51292, the State Agencies and Traynham modified the conservation easement to permit agricultural uses. The County's legal actions are responsible for transforming the pre-litigation agricultural prohibition into the current agreement between Traynham and the State Agencies allowing grazing on the property, in perpetuity." The trial court did not abuse its discretion in so ruling.

The County's second cause of action against the State Agencies claimed procedural violations of the Williamson Act, both failure to make findings required under section 51292 and lack of appropriate notice under section 51291. The County asserted, among other claims, the merits of such cause of action in its motion for preliminary injunction. Although the WCB had previously taken the position in its memo to the Department of Conservation that it did not need to make findings under section 51292 because of an exception in section 51293, the State Agencies did not assert such position in their opposition to the County's motion for preliminary injunction. The State Agencies did not address the County's claim of procedural violations of the Williamson Act at all, apparently conceding the County's procedural allegations had merit. In ruling on the motion for preliminary injunction, the trial

court found the County and Farm Bureau had demonstrated "a reasonable probability of success on the merits of their claims." As such ruling did not separate out the claims on which the court was making this finding, it necessarily included all of the County's claims, including the County's procedural claims in its second cause of action against the State Agencies. Thus, the County obtained a judicial ruling in its favor against the State Agencies on its second cause of action.[10] The relief sought by the County's second cause of action was a writ of mandate compelling the State Agencies to rescind their approval of the acquisition of Traynham's property and to comply with the procedural requirements of the Williamson Act.

In addition to the ruling against the State Agencies on the second cause of action, the preliminary injunction granted by the trial court also found a reasonable probability of success in the County's substantive claims of incompatibility of the easement with Traynham's Super Williamson Act Contract (the County's first cause of action for breach of contract against Traynham). After the granting of the preliminary injunction, Traynham became very interested in finding a way to settle the County's Williamson Act claims. Within a couple of weeks of the order granting the preliminary injunction and stay, Traynham contacted the DFG regarding an amendment to the easement and adjustment to the management plan to allow livestock grazing on the property. Traynham sought the County's agreement to his proposed language for such an amendment. When the County did not agree, the State Agencies stepped in and actively and directly negotiated an amendment that was satisfactory to the County, resulting in an amendment to the easement allowing livestock grazing to continue on the property.

---

[10] The State Agencies in their opposition to the County's motion for attorney fees belatedly argued the County did not have a meritorious cause of action against the State Agencies, contending findings were not required under section 51292 because of a different exception under section 51293 than the one they previously suggested to the Department of Conservation. (§ 51293, subd. (e)(2) as opposed to § 51293, subd. (j).) On appeal, the State Agencies again argue findings were not required because of section 51293, subdivision (e)(2). In their reply brief, the State Agencies finally address the County's notice claim, briefly asserting they gave notice to the County as required by section 51291. The State Agencies do not provide any analysis of whether such notice was adequate under section 51291.

The issue before us, however, is not whether notice was inadequate and section 51292 findings were actually required or even whether the trial court correctly ruled the County's second cause of action had a reasonable *probability* of success, but rather how the trial court's grant of a preliminary injunction on that basis impacted the litigation so that the County could or could not be considered a successful or prevailing party. Even in a "catalyst" case, where the trial court must assess whether the lawsuit had merit before awarding fees, the test does not require a final decision on the merits, but a determination that the lawsuit was not " 'frivolous, unreasonable or groundless,' " that " ' "the questions of law or fact are grave and difficult." ' " (*Graham, supra,* 34 Cal.4th at pp. 575–576.) The County's claims regarding findings and notice were clearly not frivolous, unreasonable, or groundless and raised questions of law or fact that were grave and difficult.

The State Agencies point out they had considered such an amendment as early as April 2002 and suggest this shows the County's cross-action was not a motivating factor in their decision to amend the easement. The record, however, supports an inference the State Agencies' early consideration of a grazing amendment was in response to the filing of the Farm Bureau's petition, although they thought an amendment might also be "good business . . . regardless of the lawsuit." Critically, despite this early consideration of an amendment, the record reflects the State Agencies did not further pursue the idea until after they were sued by the County and the County obtained the preliminary injunction and stay. Contrary to the State Agencies' characterization of their post-preliminary injunction actions as simply responding to Traynham's requests and as merely assisting Traynham in resolving the County's breach of contract claim against him, the trial court could reasonably have found that the State Agencies were acting under compulsion of the preliminary injunction. And to protect their project and acquisition of Traynham's property, which risked being rescinded as a result of the County's second cause of action, the State Agencies took action. The timing and nature of the State Agencies' actions support such an inference. Thus, although the State Agencies were never ultimately compelled to renotice their action to the County or to make findings under section 51292 because of the County's dismissal of its second cause of action, the County's lawsuit against the State Agencies brought the State Agencies "to the table" regarding the County's Williamson Act concerns. The practical result was an agreement regarding the easement, which agreement excused the findings requirement of section 51292 (§ 51293, subd. (a)) and apparently satisfied the County's notice concerns.

■ " 'At bottom, the inquiry [regarding whether a party is successful] is an intensely factual, pragmatic one that frequently requires courts to go outside the merits of the precise underlying dispute and focus on the condition that the fee claimant sought to change.' [Citation.] Using that condition as a benchmark, the court asks if the outcome of the litigation is one to which the ' "fee claimant's efforts contributed in a significant way, and which does involve an actual conferral of benefit or relief from burden when measured against the benchmark condition." ' [Citation.]" (*Schmier, supra,* 96 Cal.App.4th at p. 878.)

The trial court did not abuse its discretion in finding the County was a successful party against the State Agencies on its second cause of action.

B. *The County's Action Enforced an Important Right Affecting the Public Interest*

The trial court in this case ruled as follows: "The County's lawsuit enforced important public rights. The Williamson Act (Gov. Code, § 51200 et seq.)

recognizes the importance of agriculture to the economy of the State of California and seeks to maintain agricultural use on the agricultural land. The State Agencies failed to comply with the requirements of Government Code [section] 51292 which requires public agencies to make certain findings prior to public improvements in an agricultural preserve. Prior to the filing of the lawsuit, the conservation easement prohibited agricultural use of the land. The County's success in the earlier-issued injunction in this case and the amendment to the conservation easement served to enforce the spirit of the statewide goals of the Williamson Act, ensuring sustainable agricultural resources within the State." We reject the State Agencies' contention that this ruling was an abuse of discretion.

The principles applicable to a determination of whether an action enforced "an important right affecting the public interest" (§ 1021.5) have been explained by the California Supreme Court in *Woodland Hills II, supra,* 23 Cal.3d 917. We repeat a portion of those comments.

■ "Although [Code of Civil Procedure] section 1021.5 provides no concrete standard or test against which a court may determine whether the right vindicated in a particular case is sufficiently 'important' to justify a private attorney general fee award, the statutory language and the pertinent federal authorities provide at least some guidance in this area. First, . . . the broad statutory language and the federal precedents indicate that a right need not be constitutional in nature to justify the application of the private attorney general doctrine; the federal cases have applied the doctrine to the vindication of both constitutional and statutory rights. [¶] Second, the Legislature obviously intended that there be some selectivity, on a qualitative basis, in the award of attorney fees under the statute, for section 1021.5 specifically alludes to litigation which vindicates 'important' rights and does not encompass the enforcement of 'any' or 'all' statutory rights. Thus, again like the federal cases, the statute directs the judiciary to exercise judgment in attempting to ascertain the 'strength' or 'societal importance' of the right involved. [¶] ■ Of course, 'important rights' are not necessarily confined to any one subject or field. As the variety of federal cases attests, the private attorney doctrine may find proper application in litigation involving, for example, racial discrimination, the rights of mental patients, legislative reapportionment and, most significantly for the instant case, environmental protection. In litigation concerning the application of statutorily based rights in these various fields, past decisions suggest that in determining the 'importance' of the particular 'vindicated' right, courts should generally realistically assess the significance of that right in terms of its relationship to the achievement of fundamental legislative goals." (*Woodland Hills II, supra,* 23 Cal.3d at pp. 935–936, fns. omitted.)

In this case the Legislature itself has declared the Williamson Act "is necessary for the promotion of the general welfare and the protection of the public interest in agricultural land." (§ 51220, subd. (f).) The Legislature's express findings include: "That *the preservation of a maximum amount of* the limited supply of *agricultural land is necessary* to the conservation of the state's economic resources, and is necessary *not only to the maintenance of the agricultural economy of the state, but also for the assurance of adequate, healthful and nutritious food for future residents of this state and nation*," (§ 51220, subd. (a), italics added) and "[t]hat in a rapidly urbanizing society *agricultural lands have a definite public value as open space*, and *the preservation in agricultural production of such lands*, the use of which may be limited under the provisions of this chapter, *constitutes an important physical, social, esthetic and economic asset* to existing or pending urban or metropolitan developments." (§ 51220, subd. (d), italics added.)

The State Agencies argue the Williamson Act also protects habitat and wetlands as "open space" areas and that such open space areas are compatible uses within the meaning of the act. According to the State Agencies, since the original easement was intended to establish habitat and wetlands consistent with the Williamson Act, the County's action did not vindicate an important right under the act. We disagree.

■ The focus of the Williamson Act is on agricultural land, including agricultural land *as* open space. (See, e.g., § 51220, subd. (d).)[11] A city or county may choose to also include within an agricultural preserve other open spaces as defined in the Williamson Act (§§ 51201, subd. (*o*), 51205, 51230), but the act does not contemplate another public agency converting agricultural land in a city or county's agricultural preserve into an open space use, even wildlife habitat or managed wetlands, without compliance with the requirements of the Williamson Act. Moreover, even if a city or county itself places an open space use of land within its agricultural preserve, the open space use still must be consistent with the compatibility principles provided in section 51238.1, generally requiring the use "will not significantly compromise the long-term productive agricultural capability" of the land (§ 51238.1, subd. (a)(1)) and that the use "will not significantly displace or impair current or reasonably foreseeable agricultural operations" on the land. (§ 51238.1, subd. (a)(2).)

---

[11] The County has filed a request for judicial notice of a letter to Governor Edmund G. Brown from Assemblyman John C. Williamson, regarding Assembly Bill No. 2117, which the County claims memorializes the legislative intent of the Williamson Act. As this letter from the bill's author to the Governor does not indicate the author's views were made known to the Legislature as a whole, it does not constitute legislative history subject to judicial notice in this court. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 37 [34 Cal.Rptr.3d 520].) The County's request for judicial notice is denied.

The State Agencies take the position section 51238 and section 51238.1 do not apply to wildlife habitat and wetlands because "the Legislature has already determined that land devoted to habitat and wetlands may be included in an agricultural preserve, and that the term 'agricultural land' includes habitat and wetlands." (Italics omitted.) As we have noted, a city or county may include wetlands or habitat in an agricultural preserve and section 51205 does provide the term "agricultural land" as used in the Williamson Act includes habitat and wetlands. But we fail to see how this leads to a conclusion that the compatibility principles embodied in sections 51238 and 51238.1 do not apply to habitat and wetlands. Sections 51238 and 51238.1 do not use the term "agricultural land" and nowhere is their application limited as the State Agencies contend.

The County in its agricultural preserve did not include Traynham's property as an open space use. The County's Super Williamson Act Contract with Traynham specifically limited use of his property to "production of food and fiber for commercial purposes and uses compatible thereto." The list of compatible uses in the Super Williamson Act Contract did not include use of the property as a wildlife refuge or managed wetlands. The easement, on the other hand, prohibited in perpetuity the cultivation on the property of agricultural crops for commercial gain as a generally inconsistent use of the property.

In these circumstances, the County's action against the State Agencies significantly promoted the Williamson Act's legislative goals of allowing *local* governmental input and control over the preservation of agricultural land and open spaces (see, e.g., §§ 51230, 51231) by seeking to compel the State Agencies to comply with the procedural requirements of the Williamson Act. As a consequence of the County's action and the preliminary injunction and stay, the State Agencies were forced to consult with the County regarding its Williamson Act concerns, resulting in an amendment to the easement to allow continued agricultural use of the property through livestock grazing. The amendment fostered the public interest in maintaining agricultural production on lands covered by Williamson Act contracts, an interest which the Legislature has itself declared to be an important one. (§ 51220, subds. (d), (f).)

The trial court did not abuse its discretion in concluding the County's action enforced an important right affecting the public interest.

C. *The County's Action Conferred a Significant Benefit on the General Public or a Large Class of Persons*

The trial court found the "State Agencies had actively interfered with the County's contractual arrangement with Mr. Traynham. Had the County

remained on the sidelines and not taken action, the State may very well have felt that this was a green light to continue to convert agricultural land into wildlife preserves by failing to make the requisite findings which are mandated by Government Code section 51292. Over time, such an action would have an adverse effect on agriculture within the state, thereby benefiting a large group of people within the state."

The State Agencies complain the trial court never found a " 'significant benefit' stemming from the County's action," and, citing *Woodland Hills II,* "To the extent the trial court could be said to have found a benefit in the County's enforcement of the provisions of section 51292, such a benefit is too generalized to constitute a 'substantial benefit' for the purposes of an attorney fee award." The State Agencies also complain the County advanced at most the interests of its own constituents. The State Agencies repeat their contentions that the easement was consistent with the Williamson Act and that they were not required to make findings pursuant to section 51292. We reject these contentions.

■ "[T]he 'significant benefit' that will justify an attorney fee award need not represent a 'tangible' asset or a 'concrete' gain but, in some cases, may be recognized simply from the effectuation of a fundamental constitutional or statutory policy." (*Woodland Hills II, supra,* 23 Cal.3d at p. 939.) "Of course, the public always has a significant interest in seeing that legal strictures are properly enforced and thus, in a real sense, the public always derives a 'benefit' when illegal private or public conduct is rectified. Both the statutory language (*'significant* benefit') and prior case law, however, indicate that the Legislature did not intend to authorize an award of attorney fees in every case involving a statutory violation. We believe rather that the Legislature contemplated that in adjudicating a motion for attorney fees under [Code of Civil Procedure] section 1021.5, a trial court would determine the significance of the benefit, as well as the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case." (*Id.* at pp. 939–940.)

Here the ruling of the trial court makes clear the court found a "significant benefit" in the County's action, despite the trial court's failure to include the word "significant" in its findings. Moreover, the record supports the trial court's finding of significant benefit to the general public or a large class of persons from the County's action. The record describes this project as the first acquisition/restoration project under the California North Central Valley Conservation Reserve Enhancement Program. The trial court was justified in viewing this first project as a general test of the State Agencies' position that it could acquire an easement on agricultural land covered by a Williamson Act contract or Super Williamson Act Contract as part of such program

without procedurally complying with the Williamson Act. The County's litigation against the State Agencies under the Williamson Act resulted in a preliminary injunction and stay of the State Agencies' action and a practical consequence of requiring the State Agencies to consult and negotiate with the County regarding its Williamson Act concerns, ultimately resulting in a mutually agreed-upon amendment to the terms of the conservation easement. The trial court correctly viewed this outcome as having a wide effect on similar future actions of the State Agencies. Thus, the County's action did confer a significant benefit on the general public or a large class of persons.

Contrary to the claim of the State Agencies, this action is not similar to *Angelheart v. City of Burbank* (1991) 232 Cal.App.3d 460 [283 Cal.Rptr. 676, 285 Cal.Rptr. 463]. In *Angelheart* the plaintiffs successfully challenged a city's regulation of large family day care homes as being in violation of state law. (*Id.* at p. 463.) The Court of Appeal reversed a Code of Civil Procedure section 1021.5 award of attorney fees to the plaintiffs, finding the trial court abused its discretion in concluding the litigation conferred a significant benefit on a large class of persons. (*Angelheart v. City of Burbank, supra,* at pp. 468–469.) The court stated: "In the instant case, there is no evidence in the record to support the trial court's conclusion that all of the residents of Burbank seeking child care benefited from the action. In fact, there is *no evidence that there was any other person in Burbank,* like the Angelhearts, *who sought a permit for more than the 10 children allowed in a family day-care home under the former municipal ordinance.* There is no evidence that the Angelhearts' action, although successful and involving an important public policy, affected a large class of persons." (*Id.* at p. 468, italics added.) The action by the County here stands in stark contrast to such a situation, as the County's action clearly benefited its residents and the general public's interest in agricultural land, as described by the Williamson Act's legislative findings.

## D. *The County's Action Was Necessary*

The final requirement of Code of Civil Procedure section 1021.5 is that "the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate." (§ 1021.5, subd. (b).)

The State Agencies claim the "County's writ petition against [them] was not necessary to obtain an amendment to the conservation easement." (Capitalization omitted.) They claim the amendment of the easement "had no impact" on the procedural allegations raised against them as the County's alleged breach of contract claim against Traynham was the only cause of action thereby resolved. The State Agencies point out the trial court expressly

found the litigation did not compel them to make the findings required by section 51292. The State Agencies reassert they were not required to make findings under section 51292 and that the original easement was already consistent with the Williamson Act.[12]

The State Agencies' claims have been essentially answered by our previous discussion. We briefly repeat. Although a final judgment was never entered resolving the merits of the County's claims of the State Agencies' procedural violations of the Williamson Act (both lack of findings *and* inadequate notice) and compelling the State Agencies to comply, a preliminary injunction was entered on a finding of reasonable probability of success on the merits of such claims. Indeed, the State Agencies did not contest the merits of the procedural claims in their opposition to the motion for preliminary injunction. In light of that injunction and stay, the State Agencies then began to seriously address with the County its Williamson Act concerns, ultimately resulting in a mutually satisfactory amendment of the easement. The State Agencies only became substantially interested in the amendment when the Traynham project was stayed and the conservation agreement was at risk after the issuance of the preliminary injunction and stay. The record can reasonably be read to find that the State Agencies would not have followed through with the amendment, which was initially floated as an idea after the filing of the Farm Bureau's petition, without the pressure of the County's action. The trial court did not abuse its discretion in finding the County's action was necessary.

## III.

### The County Did Not Need to Meet the Requirements for a "Catalyst" Theory of Recovery

The State Agencies occupy a large portion of their appellate briefs with argument regarding the trial court's failure to make the additional findings necessary for a "catalyst" theory of recovery. (See *Graham, supra,* 34 Cal.4th at pp. 567, 575–577; *Tipton-Whittingham v. City of Los Angeles* (2004) 34 Cal.4th 604, 608 [21 Cal.Rptr.3d 371, 101 P.3d 174] (*Tipton*).) Such findings were unnecessary as this is not a catalyst case.

It is helpful to start with *Buckhannon Board & Care Home, Inc. v. West Virginia Dept. of Health and Human Resources* (2001) 532 U.S. 598

---

[12] We note the State Agencies did not argue below and make no argument on appeal regarding the "financial burden" element of this last requirement of Code of Civil Procedure section 1021.5. We therefore do not address that portion of the requirement and treat any issue regarding such element as forfeited. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2 [13 Cal.Rptr.3d 786, 90 P.3d 746] [stating that the correct legal term for loss of right based on failure to assert it in a timely fashion is forfeiture, not waiver].)

[149 L.Ed.2d 855, 121 S.Ct. 1835] (*Buckhannon*). In *Buckhannon* the United States Supreme Court rejected the catalyst theory as a basis for attorney fees awards under various federal statutes. The Supreme Court described the catalyst theory as one "which posits that a plaintiff is a 'prevailing party' if it achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct." (*Id.* at p. 601 [149 L.Ed.2d at p. 861].) The Supreme Court held, however, a plaintiff could only be considered a prevailing party if the plaintiff achieved judicial relief, e.g., a judgment on the merits or a court-ordered consent decree, which provides a "judicial *imprimatur*" on the alteration in the legal relationship of the parties. (*Id.* at p. 605 [149 L.Ed.2d at p. 863].)

In *Graham, supra*, 34 Cal.4th 553, the California Supreme Court refused to follow *Buckhannon*. (*Id.* at pp. 568–570.) Interpreting Code of Civil Procedure section 1021.5, the California Supreme Court reaffirmed under California law its endorsement of the catalyst theory (*Graham, supra*, at p. 568), which it described as the award of attorney fees "even when litigation does not result in a judicial resolution if the defendant changes its behavior substantially because of, and in the manner sought by, the litigation." (*Id.* at p. 560.) However, the California Supreme Court adopted several limitations to an award under the catalyst theory. The plaintiff must now show, in addition to establishing its lawsuit was a catalyst motivating the defendant to provide the primary relief sought, that (a) the lawsuit had merit and achieved its catalytic effect by threat of victory and (b) the plaintiff reasonably attempted to settle the litigation prior to filing the lawsuit. (*Id.* at pp. 575–577; *Tipton, supra*, 34 Cal.4th at p. 608.)

The State Agencies claim the trial court was required to make these additional findings in this case because the County voluntarily dismissed its claims following settlement. The State Agencies have applied the catalyst theory the wrong way. What makes a case come under the catalyst theory is not the voluntary action of the plaintiff, but the voluntary action of the defendant without any judicial resolution of the issues. (See Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 2d ed. 2006) § 2.24, p. 61.) This case is not one involving a voluntary change by the State Agencies without any judicial resolution of the issues. Here, the County achieved its desired result, as we have explained, through the preliminary injunction and stay issued by the trial court. Even in the federal courts after *Buckhannon*, a plaintiff who obtains a preliminary injunction that alters the relationship of the parties may have obtained the "judicial imprimatur" necessary for an award of attorney fees—without the catalyst theory. (*Watson v. County of Riverside* (9th Cir. 2002) 300 F.3d 1092, 1096.)

This is not a catalyst case. The trial court did not err in failing to make the additional findings required for a catalyst case.

## DISPOSITION

The judgment awarding respondent County its attorney fees is affirmed. Costs on appeal are awarded to respondent. (Cal. Rules of Court, rule 27(a).)

Raye, Acting P. J., and Robie, J., concurred.