Filed 2/17/15  Jones v. Wells Fargo Bank CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| OPAL JONES, et al., | B243333 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC337821) |
| v. | |
| WELLS FARGO BANK, N.A. etc., et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of Los Angeles County, Anthony J. Mohr, Judge.  Fee award reversed and remanded; cross-appeal dismissed.

Cappello & Noel, A. Barry Cappello, Leila J. Noel and Wendy D. Welkom; Pine & Pine, Norman Pine and Stacy L. Tillett for Plaintiffs and Appellants.

Skadden, Arps, Slate, Meagher & Flom, Harriet S. Posner, Carl Alan Roth, Kevin J. Minnick and Allison B. Holcombe for Defendants and Appellants.

_____

Following a class-action trial, in November 2011 a jury returned a verdict in favor of plaintiffs Opal Jones, Claudia A. Caldwell, Kalina Iovcheva, Vince Jones and C. Renae Walker Jones, on behalf of themselves and all other similarly situated (collectively referred to as plaintiffs) and against Wells Fargo Bank, N.A. and Wells Fargo Home Mortgage (collectively WF) in the amount of $3.52 million for violation of the Unruh Act. (Civ. Code, § 52.)  Thereafter, plaintiffs filed a motion requesting attorneys fees in the amount of $15,753,101.  The court awarded them $4,983,330.  WF appealed the judgment (case No. B237282) and plaintiffs appealed the order granting attorneys fees. WF filed a cross-appeal, contending that if the court reverses the class certification rulings in case No. B237282, the fee order should be remanded for recalculation.  We reverse the order awarding attorneys fees and remand.  The cross-appeal is dismissed as moot.

FACTUAL & PROCEDURAL BACKGROUND

As set forth in our opinion in case No. B237282, filed concurrently with this opinion, plaintiffs filed a complaint against WF alleging, inter alia that WF violated the Unruh Act when it refused to allow home loan officers at its minority neighborhood branches to use a computer program that was designed to help borrowers obtain lower prices on mortgages.  Although several causes of action were alleged, a class was certified only on the Unruh Act cause of action.  The jury returned a verdict finding that WF had violated the Unruh Act on 880 out of 7,348 loans and awarded statutory damages of $4,000 for each loan, resulting in a $3.52 million verdict.

After the trial ended, in November 2011, plaintiffs filed their motion for attorneys fees pursuant to the provisions in the Unruh Act which provides that a violator is liable "for any attorney's fees that may be determined by the court. . . ."  (Civ. Code, § 52, subd. (a).)  The motion was supported by declarations from plaintiffs' lawyers (A. Barry Cappello and Leila Noel) detailing the work they and others at the firm performed, their hourly rates and hours spent.  Based on the time spent in excess of 26,000 hours, plaintiffs claimed they were due $12,117,770, then requested a multiplier of 1.3 for a total of $15,733,101.  In addition they sought an award of attorneys fees to the Law

2

Offices of Jeffrey Fleitman in the amount of $722,221.50 which was calculated by computing his actual hours worked times his hourly fee ($555,555) times a multiplier of 1.3.

Plaintiffs' motion set forth the following argument in favor of the request for $15 million in fees: (1) the action enforced an important public interest right and the judgment conferred a significant benefit on a large class of persons; (2) the request for fees was reasonable in light of WF's vigorous defense, other class action claims and the harm caused by WF's discrimination; and (3) a multiplier of the actual amount of fees was warranted because of the novel and difficult legal and factual challenges, the skill of counsel, the ongoing work needed in order to distribute the award, the extraordinary success of the plaintiffs and the risk plaintiffs' counsel took in handling the case on a fully contingent basis.

Cappello's declaration stated he was the lead trial partner and attached a table of all the lawyers, paralegals, and clerical workers on the case together with their hourly rates and years of graduation or years of experience. The firm had three partners and seven associates at the time. After discounting some hours, the total number of hours was 25,247.4, resulting in fees of $12,117,770.

Cappello also enclosed an exhibit of time worked by co-counsel Fleitman and his associates, showing 1,058.2 billed for a total of $555,555. Fleitman also submitted his own declaration detailing the type of work done.

Noel stated in her declaration that WF initially claimed it did not maintain records which would clearly indicate whether the Loan Economics program was used and therefore that plaintiffs had to conduct extensive discovery. From 2007 to 2010, plaintiffs prevailed on at least 16 motions to compel discovery. WF filed a 1,278-page summary judgment motion in May 2010, which the court denied because WF had failed to properly notice the motion or seek disposition of all causes of action.

Plaintiffs also submitted the declaration of Carol Sobel, a public interest lawyer, who opined that the hours spent and fees billed were reasonable especially in light of the contingent nature of the litigation.

3

In opposition to the motion for fees, WF argued that plaintiffs achieved only limited success because they prevailed on only two percent of its claims or ten percent of the class ultimately presented to the jury. It claimed that plaintiffs only prevailed as to their claims relating to one region of WF's many branches. It suggested fees in the range of $1 million to $3.5 million. It argued that two disgruntled ex-employees from WF presented the case to the lawyers so that the lawyers did not have to spend exhaustive efforts to develop the case. WF objected to the time spent conferencing between plaintiffs' counsel. WF questioned whether any of Fleitman's fees should be paid based upon his limited participation in depositions and at trial. WF also objected to fees billed for clerical time, and contended the court should reduce the award.

In support of its opposition, WF submitted the declaration of Kevin Minnick, one of its attorneys. In his declaration, Minnick stated that he reviewed the databases and records kept by his law firm for this matter. He also reviewed the transcripts of depositions taken in this case and transcripts of trials. He found no instances in which Fleitman conducted any direct or cross examination in these depositions or made any on-the-record court appearances. He stated that WF identified 60,000 loans in the Los Angeles area which were potentially relevant to this litigation and that plaintiffs conceded that 8,808 loans met the class definition. He also attached various transcripts of deposition testimony, trial exhibits and trial testimony, as well as pleadings and various declarations attached thereto.

WF also submitted the declaration of Brad Malamud, a lawyer with an accounting degree, and the president of a company which reviews legal bills and manages law firm billings. He developed proprietary computer software which he used to review and categorize attorney fee requests. Malamud stated that reviewing or assembling time records is a category of tasks not properly compensable in attorney fee requests; that interfirm conferencing within the firm was excessively billed and a typical amount would only be $1,188,715. He analyzed the potential claims versus the prevailing claims and concluded from what defense counsel told him that there were approximately 60,000 potential claims at the beginning of the case, 12,400 potential claims in August 2009, and

4

8,808 potential claims from August 31, 2010. He determined 880 loans found by the jury were a small percentage of the potential claims and came up with greatly reduced figures.

He also stated that he had reviewed Fleitman's bill and was "informed by defense counsel that Mr. Fleitman never asked a question or made an objection at depositions. It is also my understanding that . . . Mr. Fleitman never argued on behalf of Plaintiffs, . . . did not attend much of the trial, . . . and did not examine a witness, make an objection or argument, or sit at counsel table.

*The trial court's ruling*

The court issued a 17-page ruling. The court noted WF did not dispute that counsel for plaintiffs were entitled to a fee and that it did not dispute the amount of hourly rates charged by counsel. The court generally did not question the number of hours billed by counsel, either from the Cappello firm or the Fleitman firm. It found the methodology used by WF's expert, Malumud, troubling and rejected his approach. It deducted $200,000 for internal conferencing and deducted $2,500 for clerical tasks.

The court lauded plaintiffs' counsels' efforts, stating that they achieved a very difficult goal, they managed to prove intentional discrimination by a national lending institution, they displayed extraordinary skill and talent in the trial, the discrimination may never have come to light without counsel's efforts, and that this was the first Unruh Act class action to go to trial. However, it applied a discounted multiplier (0.4) to the fees documented by counsel, reducing the fee request by 60 percent, reasoning that out of 60,000 potential loans, approximately 50,000 were abandoned since the jury only found 880 claims of harm, which was only 12 percent of their trial prayer for relief for 7,348 loans.

The trial court's ruling can be summarized as follows: (1) plaintiffs reduced their goal from what they wanted at the outset and by the time of the verdict, they received only a fraction of what they requested; (2) the Malamud declaration was not reliable methodology; (3) conferencing between attorneys is generally justifiable and appropriate, but a deduction of $200,000 in this instance was fair; (4) clerical tasks may or may not be compensable, but not unjustified to the extent claimed by Malamud, so five hours only

5

would be deducted; (5) co-counsel Fleitman's fees were reasonable and necessary, but would be subjected to the same reduction as the rest of the fees; and (6) four factors point in favor of a positive multiplier (novelty of case, attorney's high degree of competence and skill, significant civil and constitutional rights enforced, contingency of fee) but because the hours were expended which did not result in successful claims and the significance of the percentage of the claims awarded by the jury compared to the relief sought at the outset, "'a discount'"[1] of 0.4 was appropriate resulting in an award of one-third of plaintiffs' fee request.

## CONTENTIONS ON APPEAL

Plaintiffs contend the trial court erred in finding "limited success" on their claims discounting their fees. Plaintiffs did not appeal the underlying judgment nor the propriety of the jury verdict form.

## DISCUSSION

1. Standard of Review

We review an order granting an award of attorney fees for abuse of discretion. (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49 ("*Serrano III*"); *Concepion v. Amscam Holdings, Inc.* (2014) 223 Cal.App.4th 1309.) The trial judge is in the best position to decide the value of professional services rendered. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132). The discretion of the trial court, however, is "subject to the limitations of the legal principles governing the subject of the action." (*City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43, 82.) We first determine whether the court identified the appropriate legal standard. If it did, then we move to a determination of whether application of the proper legal standard was within the scope of the trial court's discretion. (*Id.* at p. 83; *Harman v. City and County of San Francisco* (2008) 158 Cal.App.4th 407, 418.) On appeal, we will only interfere with the trial court's

---

[1] Although the court and the parties referred to this as a "negative multiplier," we employ the term "discount" instead.

6

determination of the amount of fees where the trial court has manifestly abused its discretion. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095; *Conception, supra*, 223 Cal.App.4th at pp. 1319-1320.) An abuse of discretion occurs if the trial court's ruling "'transgresses the confines of the applicable principles of law.'" (*Horsford v. Board of Trustees* (2005) 132 Cal.App.4th 359, 393, quoting *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287.)

2. The Lodestar

In awarding attorney fees, the trial court first determines the "lodestar," i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate. (*PLCM Group, Inc., supra,* 22 Cal.4th at p. 1095; *Ketchum, supra,* 24 Cal.4th at p. 1132.) This initial calculation requires the court to determine the reasonable, not actual, number of hours expended by counsel. (*El Escorial Owners' Assn. v. DLC Plastering, Inc.* (2007) 154 Cal.App.4th 1337, 1366.) Class counsel has the burden of proving the reasonable number of hours they devoted to the litigation, whether through declarations or time sheets or billing records. (*Concepcion, supra,* 223 Cal.App.4th at p. 1325.)

The court did not question the reasonableness of the number of hours billed nor the hourly rates. It approved co-counsel Fleitman's time. Despite WF's protests, the court only reduced the lodestar by deducting $200,000 for interoffice conferencing and five hours of clerical time. Its comments indicate it felt these deductions were "fair" and the time was slightly "unjustified."

3. The Multiplier

After making the lodestar calculation, the court may increase or decrease that amount based upon a number of factors, including, but not limited to: (1) the novelty and difficulty of the case; (2) the attorneys' skill in presenting the issues; (3) the extent to which the case precluded the attorneys from accepting other work; and (4) the contingent nature of the work. (*Serrano III, supra*, 20 Cal.3d at p. 49, fn. omitted; *Ketchum*, *supra*, 24 Cal.4th at p. 1132.) The fee award need not bear any specific relationship to the amount of the recovery. (*Concepcion, supra*, 223 Cal.App.4th at p. 1321.) "Multipliers

7

can range from 2 to 4 or even higher." *(Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 255; see *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 324.)

In order to determine the propriety of the multiplier, we examine the factors enunciated by *Serrano III* and *Ketchum.*

### a.  Novelty and Difficulty/Attorney Skills

Here, the trial court's statements clearly indicate it felt plaintiffs' counsel was skilled and effective.  It remarked on the difficulty of proof in this case, and how unusual it was to go to trial in a class action on an Unruh Act case.[2]

### b.  Preclusion of Attorneys From Accepting Other Work/Contingent Nature

"'A contingent fee must be higher than a fee for the same legal services paid as they are performed.  The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of the services.'" (*Ketchum v. Moses, supra*, 24 Cal.4th at pp. 1132-1133.)

"It is not simply that counsel turned away paid work for a time in order to represent the class, but that counsel risked never receiving compensation *at all*.  The claims and defenses in this case raised a significant number of complex legal issues of first impression, and class counsel took a substantial risk that it would not prevail on these issues and thus would not recover a full fee.  [Citation.]" (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1217; original italics.)  Moreover if lawyers working on a contingent basis for public interest cases are not adequately compensated, competent counsel will be reluctant to accept fee award cases. (*Ketchum v. Moses, supra*, 24 Cal.4th at pp. 1132-1133.)

---

[2]    "As far as we know, this case was the first Unruh Act class action to go through a trial.  Plaintiffs' counsel displayed a high degree of competence and skill.  To say they did an excellent job is an understatement. . . . .  Here, . . . [a] jury found that a number of Wells Fargo customers, all minorities, were discriminated against in a manner that, but for a whistleblower (or a disgruntled employee), may never have come to light."

This litigation encompassed a period of over five years. During this time, plaintiff's counsel, a small firm, was not paid and could not have accepted any other substantial matters.

The trial court specifically noted that an important public right was being enforced and that such actions should be encouraged. It noted the contingent nature of the fee arrangements and the lost opportunity costs for counsel in taking this case.

### c. Amount Involved and Degree of Success

In this appeal, the contested part of the trial court's order revolves around its determination that plaintiffs only achieved limited success. The court discounted the lodestar based on its reasoning that plaintiffs only prevailed on 880 loans after starting out with 60,000, then contesting 7,348 at trial.[3] This reasoning is faulty for the reasons we set forth below.

---

[3] The court stated, inter alia: "1. Hours Not Reasonably Expended in Pursuit of Successful Claims [¶] To attempt to apportion in this case under the first step of Hensley [v. Eckerhart (1983) 461 U.S. 424, 434] is unworkable. In the first place, it is impossible to identify which 880 loans the jury had in mind when it reached its verdict. . . . No set of branches totals 880 borrowers. . . . We simply cannot pinpoint any of the 880 offending loans, Plaintiffs successfully object to Defendant's attempt to use a special jury verdict form that would have identified them. And now Plaintiffs make no effort—and present no method—to identify the basis of their success, with the result that their time records cannot be categorized . . . in order to separate successful claims from failed ones. [¶] This moves us to the second step of the Hensley analysis: . . . [¶] 2. Significance of the Overall Relief & Hours Expended to Obtain It. [¶¶] Out of 7,348 loans litigated at trial, Plaintiffs prevailed on only 880, just shy of 12%. Defendant contends that initially there were 60,000 potentially-relevant loans . . . which means that by the time of trial, Plaintiffs had abandoned approximately 50,000 of them. . . . [¶] Naturally, Plaintiffs disagree with this yardstick and say their case created a greater impact than what appears from the 880 claims, because they managed to prove intentional discrimination by a national lending institution. While this is a laudable achievement, the court is not prepared to conclude that it justifies full payment for the hours Plaintiffs' counsel expended. [¶] Courts should be generous in awarding attorney's fees pursuant to the Unruh Act. . . . [¶¶] It is not an abuse of discretion to award fees that far exceed the damage recovery. . . . [¶¶] That said, it is fitting and proper to consider the result obtained. Contrary to their assertion, Plaintiffs' counsel did not achieve extraordinary success . . .. As stated earlier, they displayed extraordinary talent and skill through the trial. . . . But that does not mean Plaintiffs achieved total victory. At best, Plaintiffs

California law, like federal law, considers the extent of a plaintiff's success a crucial factor in determining the amount of a prevailing party's attorney fees. (*Chavez v. City of Los Angeles* (2010) 47 Cal.4th 970, 989.) In addition to the four factors outlined in *Serrano III* and *Ketchum*, the trial courts may adjust fees whenever the relief is limited in comparison to the scope of the litigation as a whole. (*Harman, supra*, 158 Cal.App.4th at p. 418.) The trial court may exercise its discretion to account for limited success using a two-step procedure. First, in computing the lodestar, the court should exclude hours not reasonably expended to pursue the successful claims. Apportionment of attorneys fees are not required, however, when the issues are "so inextricably intertwined that it would be impractical or impossible to separate the attorney's time into compensable and noncompensable units. [Citations.]" (*Graciano v. Robinson Ford Sales* (2006) 144 Cal.App.4th 140, 159, 163.)

If successful and unsuccessful claims are so interrelated that segregating them is not possible, the second step in the analysis requires the court to evaluate the significance of the overall relief obtained in relation to the hours reasonably expended. "In this step of the *Hensley* analysis, . . . '"the most critical factor is the degree of success obtained." [Citations.]'" (*Harman, supra,* 158 Cal.App.4th at pp. 407, 418.)

But there is no requirement that fee awards must bear a proportional relationship to the number of successful claims; it is only one of many factors a court should consider. (*Harman, supra*, 158 Cal.App.4th at pp. 419-420.) Fees should not be reduced merely because a plaintiff prevails on only one of several factually related and closely

_____

obtained a small fraction of what they wanted, making this a limited success case. [¶¶] Winning 12% of what you want is a significantly smaller victory than winning the prayer of your complaint . [¶¶] . . . While Plaintiffs achieved the very difficult goal of proving (arguably hidden) intentional discrimination in lending, the jury's verdict reflects that Plaintiffs proved violations for only 880 of the 7,348 loans presented. [¶] A negative multiplier is appropriate for all of Plaintiffs' counsel. Their combined lodestar of $12,470,825 will be subject to a multiplier of 0.4, for a result of $4,988,330. This means that for winning almost twelve percent of their trial prayer, counsel will receive slightly more than one-third of their fee request. This accounts for the important civil and constitutional rights that cannot be valued solely in monetary terms, yet recognizes the reality of a result that was far from a total victory."

10

intertwined claims. (*Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413, 431 [FEHA discrimination case].) "[C]ourts should not reduce lodestars based on relief obtained simply because the amount of damages recovered on a claim was less than the amount requested." (*Quesada v. Thomason* (9th Cir. 1988) 850 F.2d 537, 539.) "Even in cases seeking only monetary relief, 'a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damage awards.'" (*Id.* at p. 540, citing *City of Riverside v. Rivera* (1986) 477 U.S. 561, 106 S.Ct. 2686, 2995.)

"As a general rule . . . California courts have tended to distinguish theories and claims by comparing the goals or objectives of the plaintiff's litigation with the relief ultimately obtained. [Citation.] The rule might aptly be summarized as follows: 'success counts and is to be judged. . . by the relief given or the right established.' (Dobbs, *Reducing Attorneys' Fees for Partial Success*: *A Comment on* Hensley *and* Blum, 1986 Wis. L.Rev. 835, 842.)" (*Environmental Protection Information Center v. Department of Forestry and Fire Protection* (2010) 190 Cal.App.4th 217, 240.)

WF admits it had 60,000 loans over $150,000 from that particular geographic area, which would cause plaintiffs to expend an extraordinary amount of time sifting through that information.

By the time of trial, 7,348 loans were identified.[4] The verdict form asked the jury: "4. Plaintiffs and the class they represent are entitled to damages on the following total number of loans [fill in the number of loans below]:" The jury found that number to be 880. The loans were all presented to the jury on a single theory. The jury was not asked to identify different loans with different legal theories.

While we agree that plaintiffs did not obtain a jury verdict on the majority of the claims submitted to it for review, we disagree that plaintiffs' success rate should be

---

[4]    Plaintiffs requested we take judicial notice of trial exhibit No. 1190A, a computer-generated summary of the loans which has already been lodged with the court in conjunction with case No. B237282. We grant the motion.

determined based solely on the number of loans. Indeed, the bulk of the plaintiffs' work was attempting to prove discrimination based on neighborhood, which was particularly difficult since the facts were only known to WF's employees. In order to prove the existence of discrimination, the numerosity of the claims was crucial. Therefore the existence of a class and the successful attempt at class certification was the crux of the case. For the trial court to ignore that and to base the success on the basis of the number of loans which the jury identified was error.

The number of 880 loans in the jury's verdict was inexplicable and plaintiffs did not appeal it. Because there seems to be no logical explanation for the 880 number, we cannot assume it means the jury found WF did not discriminate against any other applicants at minority neighborhood branches. The fact the discrimination occurred at all, and was identified and proven, was the indicator of success.

"[T]he class action not only benefits the individual litigant but serves the public interest in the enforcement of legal rights and statutory sanctions. . . . [¶] . . . [B]y greatly expediting the resolution of claims, class actions can create possibilities for injustice in an individual case. [Citation.]" (*Bell v. Farmers Insurance Exchange* (2004) 115 Cal.App.4th 715, 741.)

The relief obtained was significant because it would provide a claim for damages to numerous people and would serve to discourage such discriminatory behavior by all lending institutions in the future.[5] The fact of its discovery was extraordinarily significant because there is no way the consumer would have become aware of this

[5] Plaintiffs argued they obtained the relief they sought: damages plus the discontinuation of the Loan Economics Program. At oral argument they explained they did not seek injunctive relief to end the Loan Economics program because WF discontinued the practice by the time the lawsuit was filed. WF responded that it had moved away from using the program for reasons unrelated to the lawsuit, so there was no evidence plaintiffs acted as a "catalyst." (See e.g. *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 566 – "The catalyst theory is an application of the . . . principle that courts look to the practical impact of the public interest litigation in order to determine whether the party was successful, and therefore potentially eligible for attorney fees.")

practice without this litigation.  We conclude the resulting fee award was inadequate.
Plaintiffs' lawyers were entitled to recover a fee award that honored the years spent on
the case, their laudable trial skills and the risks they took in accepting the case as a
contingent matter.

    d. Error by the Trial Court

  Plaintiffs' counsel showed they had met the *Ketchum/Serrano III* factors.  The trial
court essentially agreed that the fees were reasonable, an important public right was being
enforced, that counsel lost opportunities for other work by taking on a case of this
magnitude, that the case advanced a novel theory and counsel was very skilled.
Nevertheless it applied a significant discount to the lodestar based upon a mistaken
definition of success.  The issue is whether the trial court erred as a matter of law by
misconstruing the limited success factor.  We conclude it did.

  The trial court said the *Hensley* limited success analysis was not "workable."
(*Hensley v. Eckerhart, supra*, 461 U.S. 424.)  It reasoned that because it could not
pinpoint any of the 880 offending loans, it could not identify which claims were
successful and which were not.  This reasoning is faulty because it assumes that a
percentage of the hours spent resulted in the number of 880 loans.  To the contrary, the
bulk of plaintiffs' job was to prove that the discrimination was taking place.  The fact that
the jury could not identify which loans were subject to the rules for class membership
does not mean that the other loan applicants were not subject to the discrimination.
Because the trial court did not properly apply the limited success doctrine, it abused its
discretion.

  In our opinion, the request for an enhancement of the lodestar was entirely
appropriate based on the contingent nature of the representation and the public value of
the bringing the reprehensible conduct to light.

  In *Press, supra*, 34 Cal.3d at page 311, plaintiffs were prevented from obtaining
signatures for a ballot initiative in front of a branch of a grocery store in Santa Monica.
After obtaining injunctive relief banning the defendants from denying them access, the
nonprofit corporation providing the legal services filed a request for attorney fees based

on the private attorney general statute, Code of Civil Procedure section 1021.5.  The court discounted the lodestar based on the number of signatures obtained at a particular store compared to the number of signatures obtained statewide.  The Supreme Court found that the trial court "improperly intertwined the determination of the litigation's importance with the question . . . of the amount to be awarded." (*Id.* at p. 323.)  It found that the application of the ratio of individual branch signatures to statewide signatures was illogical because the number gathered at the branch "did not diminish the importance of the rights secured." (*Ibid.*)  The court noted that the rights vindicated by the lawsuit sought to enforce fundamental constitutional rights and cannot be measured by counting the number of people deprived.  "[W]hile a trial court has discretion to determine the proper amount of an award, the resulting fee must still bear some reasonable relationship to the lodestar figure and to the purpose of the private attorney general doctrine.  If there is no reasonable connection between the lodestar figure and the fee ultimately awarded, the fee does not conform to the objectives established in *Serrano III*, and may not be upheld." (*Id*. at p. 324.)

Similarly, because this case sought to rectify discriminatory practices under the Unruh Act and the attorneys met the requirements of *Serrano III* and *Ketchum*, the application of a discount to the lodestar based on limited success when the plaintiffs prevailed on hundreds of loans, was an abuse of discretion.

DISPOSITION

The award of attorney fees is reversed and the case is remanded with directions for the trial court to consider anew the determination of a reasonable fee in accordance with the views expressed in this opinion.  Plaintiffs are awarded their costs on appeal.

As to the cross-appeal of defendants, as we have affirmed the judgment in the class certification case, it is dismissed as moot.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**                              **ZELON, J.**

14